# No. 24-3585

Consolidated with
Nos. 24-3444, 24-3450, 24-3451, 24-3527, 24-3619, 24-3621

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

RHONDA BURNETT, *et al.*,

    Plaintiffs-Appellees,

v.

NATIONAL ASSOCIATION OF REALTORS, *et al.*,

    Defendants-Appellees,

KELLER WILLIAMS REALTY, INC., *et al.*,

    Defendants,

BHH AFFILIATES, LLC, *et al.*,

    Defendants-Appellees,

RE/MAX LLC,

    Defendant,

v.

BROWN HARRIS STEVENS; THE AGENCY,

    Intervenors-Appellees,

v.

TANYA MONESTIER,

    Interested Party-Appellant.

On Appeal from the United States District Court
for the Western District of Missouri, Case No. 4:19-cv-00332 (SRB)
Hon. Stephen R. Bough

## BRIEF OF *AMICUS CURIAE* MANHATTAN INSTITUTE SUPPORTING INTERESTED PARTY-APPELLANT AND REVERSAL

Ilya Shapiro
   *Counsel of Record*
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 20017
(212) 599-7000
ishapiro@manhattan.institute

May 22, 2025

# CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eighth Cir. R. 26.1(A), *amicus curiae* Manhattan Institute states that it has no parent corporation and that it does not issue stock.

i

Appellate Case: 24-3585    Page: 2    Date Filed: 06/06/2025 Entry ID: 5524723

## TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ....................................................... ii

TABLE OF AUTHORITIES .................................................................................. iii

INTEREST OF *AMICUS CURIAE* ........................................................................1

STATEMENT OF THE ISSUE ...............................................................................1

SUMMARY OF THE ARGUMENT .......................................................................2

ARGUMENT ............................................................................................................2

    I. Courts Lack Institutional Competence to Restructure Complex Markets. ....................................................................................................2

    II. The Settlement Here Imposes *De Facto* Regulation Without Accountability or Authority ......................................................................4

    III. Antitrust Remedies Must Be Clear, Modest, and Focused ............................8

CONCLUSION .........................................................................................................9

CERTIFICATE OF COMPLIANCE .....................................................................10

CERTIFICATE OF SERVICE ...............................................................................10

# TABLE OF AUTHORITIES

**Cases**

*Marshall v. NFL*, 787 F.3d 502 (8th Cir., 2015)..................................................................7

*In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.*,
    716 F.3d 1057 (8th Cir. 2013) ...........................................................................7

*In re Wireless Tele. Fed. Cost Recovery Fees Litig.*,
    396 F.3d 922 (8th Cir. 2005) .............................................................................7

*Petrovic v. Amco Oil Co.*, 200 F.3d 1140 (8th Cir. 1999)........................................7

**Other Authorities**

Fed. R. Civ. P. 23(e)(2)..................................................................................................6

Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1 (1984)........ 2, 4, 8

Matthew C. Turk, *Regulation by Settlement*, 66 U. Kan. L. Rev.
    259 (2017) .............................................................................................................6

Richard B. Stewart, *The Reformation of American Administrative Law*,
    88 Harv. L. Rev. 1669 (1975)..............................................................................6

Warren Allen, *Unexpected Regulator: Regulation through Settlement after
    Vioxx and Bextra*, 6 Brook. J. Corp. Fin. & Com. L. 565 (2011) ..............5–6

# INTEREST OF *AMICUS CURIAE*[1]

The Manhattan Institute ("MI") is a nonprofit public policy research foundation committed to advancing the principles of limited government, free enterprise, and the rule of law. MI sponsors scholarship and regularly participates as *amicus* in cases where the boundaries between judicial action and legislative responsibility are at stake, particularly in matters involving economic regulation.

# STATEMENT OF THE ISSUE

This case raises serious concerns that go beyond antitrust liability and touch directly on the constitutional separation of powers. In using a class-action settlement to impose far-reaching structural reforms on the real estate industry—without trial, statutory mandate, or genuine public deliberation—the district court has effectively acted as a regulatory body rather than a neutral arbiter of the law. *Amicus* files this brief to urge the Court to reconsider the legitimacy and consequences of this novel and overreaching settlement.

---

[1] Pursuant to Fed. R. App. P. 29, counsel for MI sought the parties' consent for the filing of this brief. Appellant's former counsel consented, Defendant-Appellee Home Services of America took no position, and no other party responded, necessitating the accompanying motion for leave to file. Further, this brief was not authored in any part by counsel for any party, and no person or entity other than *amicus curiae* made a monetary contribution to fund its preparation or submission.

1

# SUMMARY OF THE ARGUMENT

The settlement in the instant case exemplifies a troubling expansion of judicial power through private antitrust litigation. Rather than address a proven violation of law, the court has endorsed sweeping injunctive relief that reconfigures a significant sector of the U.S. economy—real estate brokerage—without legislative authority or public accountability. As Judge Frank Easterbrook warned in his seminal article *The Limits of Antitrust*, 63 Tex. L. Rev.1 (1984), courts lack the institutional competence to remake markets and should not substitute private settlements for democratic lawmaking. This case reflects an alarming use of the class-action procedure to enact regulatory reforms through judicial decree, bypassing the separation of powers and legislative deliberation fundamental to our constitutional system.

# ARGUMENT

## I. Courts Lack Institutional Competence to Restructure Complex Markets

In his seminal article, *The Limits of Antitrust,* Judge Easterbrook warned of courts' lack of competency when it comes to deciding antitrust cases: "In most cases even a perfectly informed court will have trouble deciding what the optimal long-run structure of the industry is, because there is no 'right' balance between cooperation and competition. The judge has no benchmark. Small wonder that the history of antitrust is filled with decisions that now seem blunders." Frank H. Easterbrook, *The Limits of Antitrust*, 63 Tex. L. Rev. 1, 3 (1984).

The district court's approval of a transformative industry settlement—premised not on judicial findings but on a private agreement—highlights the very problem that Judge Easterbrook identified in *The Limits of Antitrust*. Antitrust law is a blunt instrument best suited to identifying and remedying clear violations such as collusion or price-fixing. It is not, and should not become, a vehicle for engineering new commercial norms or redesigning market architecture.

Courts are ill-equipped to engage in this kind of reform. Unlike legislatures, they do not hold hearings, solicit expert testimony, weigh competing policy goals, or deliberate over broad economic consequences. Judicial proceedings are narrow in scope and adversarial by design; they cannot accommodate the complexity or diversity of views necessary for legitimate economic policymaking.

Yet the instant settlement upends the entire framework by which tens of thousands of real estate brokers operate, based on a compromise between private parties instead of a reasoned finding of competitive harm. Rather than tailoring remedies to proven conduct, this settlement forbids the publication of buyer-broker commission offers on multiple listing services (MLSs). This restriction limits transparency without changing the underlying incentives that purportedly drive anticompetitive behavior. This move is not supported by record evidence or tied to an adjudicated violation; it reflects a negotiated workaround, not a legal judgment.

Courts lack the competence and expertise necessary to regulate complex markets. "The traditional Rule of Reason falls prey to all of the limits of antitrust. It assumes that judges can tap a fount of economic knowledge that does not exist, and it disregards the costs of judicial decision-making (including the costs of damning efficient conduct by mistake or design)." Easterbrook, *supra* at 39. When it comes to antitrust, "the cost of judicial intervention is high—it includes the risk of mistakenly condemning hard competition." *Id*. at 24. The judicial role in antitrust is to prevent unlawful restraints on trade, not to prescribe how markets must function. That task belongs to Congress and, where appropriate, to state legislatures—institutions accountable to voters and equipped to weigh tradeoffs. Transforming antitrust from a shield against monopoly into a sword for reengineering competition endangers both market efficiency and democratic legitimacy.

## II. The Settlement Here Imposes *De Facto* Regulation Without Accountability or Authority

The instant settlement's injunctive provisions represent sweeping economic regulation masquerading as legal remedy. Without banning the practice that plaintiffs alleged to be *per se* unlawful—cooperative compensation—the settlement bars MLSs from publishing commission offers. This step does not eliminate the incentive structures plaintiffs challenged; it simply obscures them, making the process more opaque and potentially less efficient. Sellers may still offer

4

commissions, and buyer agents may still seek them, only now without the centralized transparency that MLSs provide.

Even more troubling, the settlement mandates a new contractual requirement that fundamentally alters the home-buying process: prospective buyers must now sign formal representation agreements before seeing a property. This requirement, affecting buyers—not sellers, the actual plaintiff class—was neither justified by the evidence nor addressed meaningfully by the court. The Justice Department warned that the provision could entrench dominant brokers and inhibit competition. The court ignored that warning, choosing instead to ratify a backroom compromise with far-reaching implications.

This is regulation by settlement—an end-run around both legislative debate and administrative process. Settlement agreements should not be able to usurp the constitutional role of lawmakers. There is a grave danger when settlement agreements act as *de facto* rulemaking. "[T]he regulatory scheme created upon approval of one of the settlements discussed above constitute a use of power explicitly granted to 'Congress, the state legislature, or federal agencies' . . . . Nevertheless, many settlements that, in practice, serve to regulate major manufacturers or industries have been approved in recent years and have avoided constitutional scrutiny." Warren Allen, *Unexpected Regulator: Regulation through*

5

*Settlement after Vioxx and Bextra*, 6 *Brook. J. Corp. Fin. &* Com. L. 565, 574 (2011) (discussing the Pfizer, Merck, and tobacco settlements).

Regulation by settlement allows private parties to circumvent the checks and balances inherent in our legal system and, instead, create public policy or rulemaking free from accountability.

> Regulation by settlement has two defining features. First, although regulatory settlements are nominally packaged in the form of particularized adversarial disputes, agencies now leverage those agreements in a manner that effectively establishes new legal standards of general applicability. They are a tool for setting policy. Second, the procedural posture of those settlements allows agencies to engage in a uniquely freewheeling mode of regulation, which sidesteps nearly all of the legal constraints that are familiar to the standard administrative model.

Matthew C. Turk, *Regulation by Settlement*, 66 U. Kan. L. Rev. 259, 260 (2017). *See* also Richard B. Stewart, *The Reformation of American Administrative Law*, 88 Harv. L. Rev. 1669, 1687 (1975) ("Many of the policy decisions most strongly attacked by agency critics—the failure to prosecute vigorously, the working out of agency policy by negotiation with regulated firms, the quiet settlement of litigation once initiated—take place through informal procedures where the traditional controls have not normally applied.") (citations omitted).

When it comes to class action settlements, such settlements should be approved only after a hearing is held and after a finding is made that the settlement is fair, reasonable, and adequate. *See* FRCP 23(e)(2) ("If the proposal would bind

6

class members, the court may approve it only after a hearing and only on finding that it is fair, reasonable, and adequate. . ."); *Marshall v. NFL*, 787 F.3d 502, 508 (8th Cir. 2015) ("The district court may only approve a class action settlement if it is 'fair, reasonable, and adequate.'") (citing Fed. R. Civ. P. 23(e)(2)); *In re Uponor, Inc. F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013); *In re Wireless Tele. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 932 (8th Cir. 2005); *Petrovic v. Amco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999).

In this case, the relief was negotiated by private litigants, approved by a court with limited information, and imposed nationwide without any mechanism for public input, revision, or repeal. Indeed, several state legislatures have pending bills to counteract the very contract provisions that the settlement now imposes nationwide. Yet this judicially sanctioned private accord overrides both state experimentation and federal deliberation alike.

The result is a judicially imposed commercial standard that reaches far beyond the plaintiff class or the contested conduct. It binds non-parties, reshapes buyer behavior, and alters how information is disseminated in the market—all without a trial or statutory authorization. The court's conclusion that this relief creates a "better and more competitive marketplace" is precisely the kind of value judgment best left to policymakers accountable to the electorate, not to Article III judges resolving private disputes.

7

## III. Antitrust Remedies Must Be Clear, Modest, and Focused

Judge Easterbrook wisely observed that antitrust law's strength lies in its restraint. Rather than relying on naked restraints, however, he recommended a series of sequential filters—such as market power, a link between profit and reduced competition, identical practices, output, and plaintiff identity—for antitrust analysis. In recommending these filters, Judge Easterbrook wrote, "Antitrust is an imperfect tool for the regulation of competition. . . . Each filter should be designed to screen out beneficent conduct and pass only practices that are likely to reduce output and increase price." Easterbrook, *supra* at 39. Antitrust's core commands—don't collude, don't fix prices—are negative in nature and relatively easy to administer. But when courts depart from them to craft complex structural remedies, they risk unintended consequences, regulatory confusion, and economic distortion.

The settlement here is a prime example. Prohibiting MLSs from publishing commission offers may reduce price transparency and frustrate consumer choice. Mandating pre-showing contracts for buyers may entrench existing market players by locking in consumers before they can shop around. These are not incidental risks—they are foreseeable outcomes of poorly tailored "solutions" imposed without a full understanding of market dynamics or access to meaningful public input.

Antitrust courts must practice judicial humility. Structural reforms require extensive economic modeling, pilot testing, and ongoing monitoring—capacities

8

that courts do not possess. Worse, this remedy emerged from a private settlement, not public debate or legislative enactment. It reflects the preferences and priorities of settling parties, not the broader interests of consumers, taxpayers, or voters.

The use of Rule 23 to bless and impose such reform is especially troubling. Class action procedure is a powerful tool that must be used with caution. When courts allow litigants to negotiate forward-looking commercial policy as part of a class settlement, they transform Rule 23 into a shadow legislature—one without elections, public hearings, or democratic legitimacy.

## CONCLUSION

The District Court's approval of the settlement agreement resulted in a judicially imposed commercial standard that reaches far beyond both the plaintiff class and the contested conduct. The wide-ranging settlement agreement binds non-parties, reshapes buyer behavior, and alters how information is disseminated in the market—all without a trial or statutory authorization. It should be rejected.

Respectfully submitted,

Dated: May 22, 2025

/s/Ilya Shapiro
Ilya Shapiro
   *Counsel of Record*
Tim Rosenberger
MANHATTAN INSTITUTE
52 Vanderbilt Ave.
New York, NY 20017
(212) 599-7000
ishapiro@manhattan.institute

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Federal Rule of Appellate Procedure 29(a)(5) because this brief contains 1,936 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f), as determined by the word counting feature of the software (Microsoft Office 365) used to prepare this brief.

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface, 14-point Times New Roman.

Dated: May 22, 2025

*/s/ Ilya Shapiro*
Ilya Shapiro
Counsel for *Amicus Curiae*

# CERTIFICATE OF SERVICE

I hereby certify that on May 22, 2025, I electronically filed the above with the Clerk of Court using the CM/ECF system which will send notification of this filing to counsel for all parties.

*/s/ Ilya Shapiro*
Ilya Shapiro
Counsel for *Amicus Curiae*