## IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

Rhonda Burnett, individually and on behalf of all others
similarly situated, *et al.*,
*Plaintiffs-Appellees*
*v.*
National Association of Realtors, *et al.*,
*Defendants-Appellees*
*v.*
Brown Harris Stevens, *et al.*,
*Intervenors-Appellees*
*v.*
Spring Way Center, LLC, Monty March, Robert Friedman,
Benny D. Cheatham, *et al.*, and
James Mullis,
*Objectors-Appellants*
*v.*
Tanya Monestier and Rosalie Doyle, *et al.*,
*Interested Parties-Appellants*

―――――――――――――――

Appeal from the United States District Court
for the Western District of Missouri, Western Division
Civil Docket No. 4:19-cv-00332-SRB
The Honorable Stephen R. Bough, District Judge

## BRIEF OF PLAINTIFFS-APPELLEES

| | |
|---|---|
| Michael S. Ketchmark | Brandon J.B. Boulware |
| Scott A. McCreight | Jeremy M. Suhr |
| KETCHMARK & MCCREIGHT, P.C. | BOULWARE LAW LLC |

*Attorneys for Plaintiffs-Appellees*

[Additional Counsel Listed on Signature Page]

## SUMMARY OF THE CASE

After years of hard-fought litigation, Plaintiffs reached antitrust settlements that reform the residential real estate industry and recover hundreds of millions of dollars for class members. The class reaction has been overwhelmingly positive. Of the millions receiving notice, only 39 class members opted out and only 36 objected. By contrast, class members have submitted claims for over two million transactions.

Most objections in this appeal were submitted by counsel in copycat cases filed long after – and on the back of – Class Counsel's successes. In addition, a law professor seeks to second-guess the practice changes secured. And a group of National Association of Realtors ("NAR") members complain that they should have been allowed to intervene on the eve of the final approval hearing even though they are not class members. The District Court properly weighed and rejected each of these Objectors' arguments in its comprehensive 87-page order.

If the Court decides oral argument would be useful, Plaintiffs believe that 10 minutes for each side is sufficient.

# TABLE OF CONTENTS

SUMMARY OF THE CASE ...................................................................i

STATEMENT OF THE CASE ............................................................ 1

I. THE *BURNETT AND MOEHRL CASES*................................... 1

II. SUMMARY OF THE SETTLEMENTS....................................... 3

    A. Money Benefits ..................................................... 3

    B. Injunctive Relief .................................................. 5

III. CLASS REACTION TO THE SETTLEMENTS ......................... 6

IV. SUMMARY OF THE OBJECTIONS RECEIVED ...................... 6

    A. The South Carolina Objections (Cheatham) ..................... 7

    B. The Pennsylvania Objection (Spring Way Center) ........... 7

    C. The New York Objections (March and Friedman)............. 8

    D. The Illinois Objection (Mullis) .......................................... 9

    E. The *Pro Se* Objections (Wang and Monestier) ................. 10

    F. Non-Class Member Realtors Attempting to Intervene (Doyle) ............................................................................ 11

V. THE FAIRNESS HEARING AND FINAL APPROVAL........... 11

SUMMARY OF THE ARGUMENT ....................................................... 12

ARGUMENT ....................................................................................... 13

I. STANDARD OF REVIEW....................................................... 13

II. THE DISTRICT COURT PROPERLY CONSIDERED THE RULE 23(E)(2) AND *VAN HORN* FACTORS........................... 14

    A. The Settlements Confer Great Benefits to the Class and Eliminate the Risk of Continued Litigation .................... 15

    B. The Settlements Extract the Most That Defendants Could Reasonably Be Expected to Pay and Remove the Risk of Insolvency ..................................................................... 17

C.    The Settlements Provide Immediate Benefits to the Class and Avoid the Complexity and Expense of Further Litigation ........................................................ 17

D.    Class Reaction to the Settlements Is Overwhelmingly Positive................................................................ 18

E.    Every Rule 23(e)(2) Factor Favors Approval ................... 19

III.    THE DISTRICT COURT PROPERLY OVERRULED THE MULLIS OBJECTION ........................................................... 21

A.    The Settlements Treat Class Members Equitably Relative to Each Other.................................................... 22

B.    The Settlements Properly Release All Claims Arising from the Same Factual Predicate..................................... 24

C.    The Class Representatives and Their Counsel Provided Adequate Representation ................................ 28

IV.    THE DISTRICT COURT PROPERLY OVERRULED THE MARCH AND FRIEDMAN OBJECTIONS ............................. 31

A.    Objectors' Claims Arise from the Same Factual Predicate as Plaintiffs' Claims......................................... 31

B.    March and Friedman's Other Objections Also Lack Merit ................................................................. 37

V.    THE DISTRICT COURT PROPERLY OVERRULED THE MONESTIER OBJECTION ..................................................... 38

A.    Plaintiffs Have Standing to Obtain Practice Changes .... 38

B.    Eliminating the Challenged Practices Benefits the Class ........................................................................ 42

C.    The Attorneys' Fees Award Falls Squarely within the Range Approved as Reasonable ....................................... 48

VI.    THE DISTRICT COURT PROPERLY OVERRULED THE CHEATHAM AND SPRING WAY CENTER OBJECTIONS... 54

VII.    THE DISTRICT COURT PROPERLY DENIED THE DOYLE MOTION TO INTERVENE....................................................... 57

A. The Intervention Motion Was Untimely ........................... 58

B. The Doyle Intervenors Failed to Satisfy the Rule 24 Requirements ................................................................. 60

VIII. APPELLANTS WHO FAILED TO APPEAR AT THE FINAL SETTLEMENT HEARING WAIVED THEIR OBJECTIONS . 61

IX. THE DISTRICT COURT COMMITTED NO ERROR IN REQUESTING A PROPOSED ORDER ................................... 65

CONCLUSION ....................................................................... 67

# TABLE OF AUTHORITIES

## Cases

*ACLU of Minnesota v. Tarek ibn Ziyad Acad.*,
  643 F.3d 1088 (8th Cir. 2011) ..............................................................58

*Allapattah Servs., Inc. v. Exxon Corp.*,
  454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...............................................52

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ....................................................................29, 30

*Anderson v. City of Bessemer City*,
  470 U.S. 564 (1985) ..............................................................................66

*Babu v. Wilkins*,
  No. 22-15275, 2023 WL 6532647 (9th Cir. Oct. 6, 2023) ....................44

*Batton v. Nat'l Ass'n of Realtors*,
  No. 21-cv-00430, 2024 WL 689989 (N.D. Ill. Feb. 20, 2024) ...........9, 10

*Berry v. Schulman*,
  807 F.3d 600 (4th Cir. 2015) ..............................................................54

*Center for Biological Diversity v. Strommen*,
  114 F.4th 939 (8th Cir. 2024)..............................................................40

*Christina A. ex rel. Jennifer A v. Bloomberg*,
  315 F.3d 990 (8th Cir. 2003) ..............................................................41

*City of Los Angeles v. Lyons*,
  461 U.S. 95 (1983) ..............................................................................39

*Clinton v. City of New York*,
  524 U.S. 417 (1998) ............................................................................40

*Curry v. Regents of Univ. of Minnesota*,
  167 F.3d 420 (8th Cir. 1999) ..............................................................60

*Davis v. Hanna Holdings, Inc.*,
  771 F.Supp.3d 552 (E.D. Penn. 2025) ................................. 41

*DeBoer v. Mellon Mortg. Co.*,
  64 F.3d 1171 (8th Cir. 1995) ........................................ 18

*Dennis v. JPMorgan Chase & Co.*,
  No. 16-cv-9496, 2021 WL 1893988 (S.D.N.Y. May 11, 2021) .............. 37

*Dietz v. Bouldin*,
  579 U.S. 40 (2016) .................................................. 65

*Eichorn v. AT&T Corp.*,
  248 F.3d 131 (3d Cir. 2001) ......................................... 45

*Frank v. Gaos*,
  586 U.S. 485 (2019) ................................................. 41

*Grunin v. Int'l House of Pancakes*,
  513 F.2d 114 (8th Cir. 1975) ........................................ 56

*Hershey v. ExxonMobil Oil Corp.*,
  No. 07-1300, 2012 WL 5306260 (D. Kan. Oct. 26, 2012) ............ 62, 63

*Hesse v. Sprint Corp.*,
  598 F.3d 581 (9th Cir. 2010) ........................................ 37

*Huyer v. Buckley*,
  849 F.3d 395 (8th Cir. 2017) .................................... 49, 51

*Huyer v. Njema*,
  847 F.3d 934 (8th Cir. 2017) ........................................ 14

*Illinois Brick Co. v. Illinois*,
  431 U.S. 720 (1977) ................................................. 10

*In re Agent Orange Prod. Liab. Litig.*,
  818 F.2d 145 (2d. Cir. 1987) ........................................ 23

*In re BankAmerica Corp. Sec. Litig.*,
  350 F.3d 747 (8th Cir. 2003) ........................................ 13

*In re Blue Cross Blue Shield Antitrust Litig. MDL 2406,*
  85 F.4th 1070 (11th Cir. 2023) .............................................. 19

*In re Cardizem CD Antitrust Litig.,*
  218 F.R.D. 508 (E.D. Mich. 2003) ................................. 23, 63

*In re Currency Conversion Fee Antitrust Litig.,*
  264 F.R.D. 100 (S.D.N.Y. 2010) .......................................... 37

*In re Domestic Airline Travel Antitrust Litig.,*
  378 F. Supp. 3d 10 (D.D.C. 2019) ...................................... 23

*In re Dry Max Pampers Litig.,*
  724 F.3d 713 (6th Cir. 2013) .............................................. 52

*In re Equifax Inc. Customer Data Sec. Breach Litig.,*
  999 F.3d 1247 (11th Cir. 2021) ............................... 29, 63, 64

*In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.,*
  357 F.3d 800 (8th Cir. 2004) ........................................ 25, 55

*In re High-Tech Emp. Antitrust Litig.,*
  No. 11-CV-02509, 2014 WL 3917126 (N.D. Cal. Aug. 8, 2014) ...........52

*In re Literary Works in Elec. Databases Copyright Litig.,*
  654 F.3d 242 (2d Cir. 2011) ................................................ 29

*In re Namenda Direct Purchaser Antitrust Litig.,*
  462 F. Supp. 3d 307 (S.D.N.Y. 2020) ................................. 22

*In re Navy Chaplaincy,*
  697 F.2d 1171 (D.C. Cir. 2012) .......................................... 39

*In re Target Corp. Customer Data Sec. Breach Litig.,*
  892 F.3d 968 (8th Cir. 2018) ................................... 13, 30, 49

*In re T-Mobile Customer Data Sec. Breach Litig.,*
  111 F.4th 849(8th Cir. 2024) ..................................... *passim*

*In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.,*
  716 F.3d 1057 (8th Cir. 2013) .................................... *passim*

*In re U.S. Bancorp Litig.*,
   291 F.3d 1035 (8th Cir. 2002) ............................................. 49

*In re Wireless Tel. Fed. Cost Recovery Fees Litig.*,
   396 F.3d 922 (8th Cir. 2005) ................................... 16, 18, 62

*Index Newspapers LLC v. U.S. Marshals Servs.*,
   977 F.3d 817 (9th Cir. 2020) ............................................. 39

*Int'l Bhd. of Elec. Workers, Loc. Union No. 545 v. Hope Elec. Corp.*,
   380 F.3d 1084 (8th Cir. 2004) ........................................... 45

*James v. JP Morgan Chase Bank, N.A.*,
   No. 8:15-cv-2424, 2016 WL 6908118 (M.D. Fla. Nov. 22, 2016) .......... 63

*Johnston v. Comerica Mortg. Corp.*,
   83 F.3d 241 (8th Cir. 1996) ............................................. 48

*Keil v. Lopez*,
   862 F.3d 685 (8th Cir. 2017) ...................................... *passim*

*Leeder v. Nat'l Ass'n of Realtors*,
   601 F. Supp. 3d 301 (N.D. Ill. 2022) .................................... 9

*Marshall v. Nat'l Football League*,
   787 F.3d 502 (8th Cir. 2015) ...................................... *passim*

*Matushita Elec. Indust. Co., Ltd. v. Epstein*,
   516 U.S. 367 (1996) .................................................... 41

*Med. Liab. Mut. Ins. Co. v. Alan Curtis LLC*,
   485 F.3d 1006 (8th Cir. 2007) ........................................... 60

*Moehrl v. Nat'l Ass'n of Realtors*,
   No. 19-cv-01610, 2023 WL 2683199 (N.D. Ill. March 29, 2023) .... 39, 40

*Moratis v. West Penn Multi-List, Inc.*,
   No. 2:23-cv-2061, 2024 WL 4436425 (W.D. Pa. Oct. 7, 2024) ............... 8

*Murphy v. Jones*,
   877 F.2d 682 (8th Cir. 1989) ........................................... 37

*Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*,
  660 F.2d 9 (2d Cir. 1981) .............................................. 27, 37

*Nat'l Wildlife Fed'n v. Agric. Stabilization & Conservation Serv.*,
  955 F.3d 1199 (8th Cir. 1992) ............................................ 41

*Ortiz v. Fibreboard Corp.*,
  527 U.S. 815 (1999) ............................................. 23, 29, 30

*O'Shea v. Littleton*,
  414 U.S. 488 (1974) ..................................................... 39

*Pearson v. NBTY, Inc.*,
  772 F.3d 778 (7th Cir. 2014) ............................................ 52

*Petrovic v. Amoco Oil Co.*,
  200 F.3d 1140 (8th Cir. 1999) ...................................... *passim*

*Prof'l Firefighters Ass'n of Omaha, Local 385 v. Zalewski*,
  678 F.3d 640 (8th Cir. 2012) ............................................ 56

*Rawa v. Monsanto*,
  934 F.3d 862 (8th Cir. 2019) ...................................... *passim*

*Rutter & Wilbanks Corp. v. Shell Oil Co.*,
  314 F.3d 1180 (10th Cir. 2002) ......................................... 57

*South Dakota ex rel. Barnett v. U.S. Dept. of Interior*,
  317 F.3d 783 (8th Cir. 2003) ............................................ 61

*Thompson v. Edward D. Jones & Co.*,
  992 F.2d 187 (8th Cir. 1993) ...................................... *passim*

*United Food and Com. Workers Union, Loc. No. 663 v. U.S. Dep't of
  Agric.*
  36 F.4th 777 (8th Cir. 2022) ........................................ 58, 59

*United States v. Atlanta Real Est. Bd.*,
  No. 14744, 1972 WL 516 (N.D. Ga. Feb. 4, 1972) ......................... 34

*United States v. Metro. St. Louis Sewer Dist.*,
  569 F.3d 829 (8th Cir. 2009) ............................................ 60

*United States v. Nat'l Ass'n of Real Est. Bds.*,
  339 U.S. 485 (1950) ............................................................... 34

*United States v. Realpage, Inc.*,
  No. 1:24CV710, 2024 WL 5186598 (M.D.N.C. Dec. 20, 2024) ............ 47

*Van Horn v. Trickey*,
  840 F.2d 604 (8th Cir. 1988) ....................................... 14, 15

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
  396 F.3d 96 (2d. Cir. 2005) ................................................ 27

*Worth v. Jacobson*,
  108 F.4th 677 (8th Cir. 2024) .......................................... 40

## Rules

Fed. R. Civ. P. 23(e)(2) .................................................. 14, 19

W.D. Mo. Local Rule 7.0(f) .................................................. 66

## Other Authorities

13D Wright & Miller, Federal Practice & Procedure § 3567.1 (2005) ... 36

## STATEMENT OF THE CASE

This case involves a pathbreaking challenge to anticompetitive rules in the residential real estate industry, which inflated real estate commissions throughout the country. At issue are objections to Settlements that Plaintiffs reached with NAR and one of its co-conspirators after trial but before appeal.

## I. THE *BURNETT* AND *MOEHRL* CASES

NAR's anticompetitive rules were in place for decades before any public or private litigation. Friedman.App.991; R.Doc.1595-1, at ¶7. That changed in 2019 with the filing of this case (*Burnett*) and *Moehrl* (*Moehrl v. Nat'l Ass'n of Realtors, et al.*, Case No 1:19-cv-01610 (N.D. Ill.)).

Both *Burnett* and *Moehrl* brought federal Sherman Act claims against NAR and the nation's four largest real estate brokerage companies. Each alleged a conspiracy to enforce rules centered on requiring home sellers to make blanket unilateral offers of compensation to buyer brokers working against them. March.App.324–25; R.Doc.1458, at 8–9. The defendants in *Burnett* and *Moehrl* were NAR, Anywhere Real Estate Inc., RE/MAX, LLC, Keller Williams Realty, Inc., and

HomeServices of America, Inc. and certain of its subsidiaries ("HomeServices").

The litigation was hotly contested. Defendants collectively hired more than 20 top national defense firms who raised every defense and contested every issue. Friedman.App.992–93; R.Doc.1595-1, at ¶12. The cases involved more than 5 million documents, 180 depositions, and 20 experts who produced 43 reports. Friedman.App.993; R.Doc.1595-1, at ¶¶13–14. Plaintiffs defeated two motions to dismiss, five motions for summary judgment, and three motions to compel arbitration. SWC.App.3038; R.Doc.1595-1, at ¶13. There were two appeals to this Court on arbitration issues, a denied petition for writ of certiorari, and two Rule 23(f) petitions that were denied by this Court and the Seventh Circuit. *Id.*[1] Both *Burnett* and *Moehrl* were certified to proceed as class actions. Friedman.App.867; R.Doc.1595, at 16. They remain the only certified litigation classes involving the challenged rules. Friedman.App.992; R.Doc.1595-1, at ¶8. Ultimately, unlike with many

---

[1] As of final approval, Plaintiffs' counsel had performed more than 107,500 hours of work and advanced over $16 million in case expenses. SWC.App.625–26; R.Doc.1535, at 2–3. Those numbers continue to increase.

antitrust class actions, *Burnett* went to trial against three Defendants, including NAR and HomeServices. At that trial the jury returned a $1,785,310,872 verdict for Plaintiffs. SWC.App.140–41; R.Doc.1294, at 2.

## II.  SUMMARY OF THE SETTLEMENTS

The NAR and HomeServices Settlements, which settle the claims in *Burnett*, *Moehrl*, and *Gibson*, provide both money to the class and extensive injunctive relief.[2]

### A.  Money Benefits

HomeServices agreed to pay $250 million. Friedman.App.871; R.Doc.1595 at 20. NAR agreed to pay $418 million. *Id*. The NAR Settlement also includes an opt-in structure for MLSs and certain NAR member brokerages. Doyle.App.22–24; R.Doc.1622, at ¶44. Twenty-eight brokerages and non-Realtor MLSs opted in and made additional payments of $30,587,754, bringing the NAR Settlement total to $448,587,754. Friedman.App.871; R.Doc.1595, at 20.

---

[2] After the *Burnett* trial, Plaintiffs filed *Gibson v. NAR, et. al.*, No. 4:23-cv-0788 in the Western District of Missouri. *Gibson* alleges the same claims as in *Burnett* and *Moehrl*, but extended to additional defendants and geographic areas.

All settlement funds consist entirely of cash (not discounts or coupons) and are non-reversionary, meaning the entire amount will be paid for the class's benefit, no matter how many claims and opt-outs. Friedman.App.872; R.Doc.1595, at 21. These amounts are on top of money obtained in related settlements. *Id.* The total of all settlements to date exceeds $1 billion.

In negotiating these payments, Plaintiffs took the most that Defendants reasonably could pay. Neither NAR nor HomeServices had enough funds to pay even the *Burnett* judgment. Doyle.App.15; R.Doc.1622, at ¶29. NAR's payment of $418 million represented over 55% of its total assets, leaving barely enough to cover operating costs. Friedman.App.1326; R.Doc.1597, at 8. And HomeServices had so little money that it couldn't even post an appeal bond and was in danger of being pushed into bankruptcy. Burnett.App.280; R.Doc.1596, at 12. The Settlements are superior to what the Class could have recovered in bankruptcy proceedings and provide the most money the Class could obtain through any means.

## B. Injunctive Relief

Defendants further agreed to remove the challenged rules from their business practices. Among other things, NAR agreed to eliminate all requirements that listing brokers or sellers make offers of compensation to buyer brokers, and that compensation "offers, if made, must be blanket, unconditional, or unilateral." Friedman.App.872; R.Doc.1595, at 21. The opt-in MLSs and brokerages likewise agreed to abide by these terms. Doyle.App.22–24; R.Doc.1622, at ¶44. And HomeServices agreed to similar practice changes. Doyle.App.46–47; R.Doc.1622, at ¶94.

Plaintiffs developed and negotiated these practice changes in consultation with leading experts, including Professors Einer Elhauge and Roger Alford. Dr. Elhauge, a Professor of Law and Economics at Harvard University, was the Chairman of President Obama's Antitrust Advisory Committee. Friedman.App.875; R.Doc.1595, at 24. He is well regarded as a thought leader in economics and the law. *Id*. Professor Alford taught at the University of Notre Dame for many years and is now the Principal Deputy Assistant Attorney General at the Antitrust Division of the U.S. Department of Justice ("DOJ"). *Id*. The practice

changes are expected to result in further billions in savings for the class members by reducing commission rates in the future. SWC.App.816–19; R.Doc.1535-13, at ¶¶13–17.

## III. CLASS REACTION TO THE SETTLEMENTS

The District Court approved a comprehensive notice plan using direct notice, targeted digital efforts, an internet search campaign, a case-specific Settlement website, a toll-free telephone number, and publication. Friedman.App.1039–40; R.Doc.1595-7, at 3–4. This notice reached more than 99% of the more than 30 million class members. Friedman.App.1048; R.Doc.1595-7, at 12. By the date of approval, class members had submitted 491,490 claimed transactions. Friedman.App.1050–51; R.Doc.1595-7, at 14–15. The claims period extended through May 9, 2025, and this number is now over two million. *Id*. Against this positive response, only 39 class members opted out (.00013% of the Class), and only 36 submitted objections (.00012% of the Class). Doyle.App.4; R.Doc.1622, at ¶4.

## IV. SUMMARY OF THE OBJECTIONS RECEIVED

Most of the objections were lodged by counsel for plaintiffs in other cases filed after *Burnett* and *Moehrl*. None of these cases involve a

certified class, and all are in their infancy. Friedman.App.931; R.Doc.1595, at 80. Each copied from *Burnett* and *Moehrl* and was filed only after – and on the back of – Class Counsel's successes. *Id*. Two other objections were filed by *pro se* litigants who contend the practice changes should have been different. And a third group are NAR members who wish to intervene to attack their own organization's Settlement.

## A.    The South Carolina Objections (Cheatham)

Six days after the *Burnett* verdict, two South Carolina law firms filed *Burton v. Nat'l Ass'n of Realtors, et al.*, No. 7:23-cv-05666 (D.S.C.). The allegations in *Burton* are virtually identical to those in *Burnett* and *Moehrl*.

The *Burton* law firms filed the objections that are the subject of Case No. 24-3527. SWC.App.1074; R.Doc.1555-1; SWC.App.1100; R.Doc.1558-1. They also filed similar objections to settlements reached with other Defendants, which are the subject of Case Nos. 24-2391 and 24-3564.

## B.    The Pennsylvania Objection (Spring Way Center)

A month after the *Burnett* verdict, a Pennsylvania law firm filed *Spring Way Ctr., LLC v. W. Penn Multi-List, Inc.*, No. 2:23-cv-2061 (W.D.

Pa.). *Spring Way Center* asserts claims against a Pittsburgh MLS, as well as several brokerages affiliated with the Defendants here. As with *Burton*, the allegations in *Spring Way Center* are virtually identical to those in *Burnett* and *Moehrl*.

Several *Spring Way Center* Defendants reached settlements with Plaintiffs' Counsel in separate cases related to *Burnett* and *Moehrl*. These Defendants contributed to the class members' additional recovery. Other Defendants successfully moved to dismiss the *Spring Way Center* action. *Moratis v. W. Penn Multi-List, Inc.*, No. 2:23-cv-2061, 2024 WL 4436425, at *4–6 (W.D. Pa. Oct. 7, 2024).

The *Spring Way Center* law firm filed the objection that is the subject of Case No. 24-3444. SWC.App.2752; R.Doc.1563. It also filed similar objections to settlements reached with other Defendants, which are the subject of Case No. 24-2168.

### C.    The New York Objections (March and Friedman)

Two weeks after the *Burnett* verdict, a group of law firms filed *March v. Real Estate Bd. of New York, Inc.*, No. 1:23-cv-09995 (S.D.N.Y.). Two months later, a second group of law firms filed *Friedman v. Real Est. Bd. of New York, Inc.*, Case No. 1:24-cv-00405. Both cases assert claims

against the Real Estate Board of New York ("REBNY"), as well as several Defendants here. As with *Burton* and *Spring Way Center*, the allegations in *March* and *Friedman* are virtually identical to those presented in *Burnett* and *Moehrl*.

The *March* law firms filed the objection that is the subject of Case No. 24-3450. March.App.651; R.Doc.1562. They also filed a similar objection to settlements reached with other Defendants, which is the subject of Case No. 24-3478.

The *Friedman* law firms filed the objection that is the subject of Case No. 24-3451. March.App.530; R.Doc.1560. They also filed a similar objection to settlements reached with other Defendants, which is the subject of Case No. 24-3481.

### D.   The Illinois Objection (Mullis)

The Mullis Objection arises from yet another copycat case, this one in the Northern District of Illinois. *Batton v. Nat'l Ass'n of Realtors, et al.*, No. 21-cv-430 (N.D. Ill.). Filed in 2021, almost two years after *Burnett* and *Moehrl*, *Batton* raised the same basic allegations but sought recovery for home buyers rather than home sellers. Because these home buyers are indirect purchasers, they lack standing to pursue damages under the

federal Sherman Act. *Illinois Brick Co. v. Illinois*, 431 U.S. 720, 729 (1977). The *Batton* court dismissed the case in 2022 for that reason. *Leeder v. Nat'l Ass'n of Realtors*, 601 F. Supp. 3d 301, 311 (N.D. Ill. 2022). The *Batton* plaintiffs then filed an amended complaint seeking only injunctive relief under federal law, along with indirect purchaser antitrust and consumer protection claims under various state laws. The *Batton* court dismissed the refiled federal law claim but allowed some state counts to proceed. *Batton v. Nat'l Ass'n of Realtors*, No. 21-cv-00430, 2024 WL 689989, at *4, *14 (N.D. Ill. Feb. 20, 2024). *Batton* is still in discovery.

The *Batton* law firms filed the Mullis objection that is the subject of Case No. 24-3619. SWC.App.1891; R.Doc.1561. They also filed similar objections to settlements reached with other Defendants, which are the subject of Case Nos. 24-2143 and 24-2473.

### E. The *Pro Se* Objections (Wang and Monestier)

Besides the copycat lawyers, two *pro se* parties also filed objections.

Hao Zhe Wang is a serial *pro se* litigant who opted out of all the settlements involving corporate Defendants, but remained in the NAR

Settlement class solely to object. His objection is the subject of Case No. 24-3589.

Tanya Monestier is a law professor who teaches contracts. SWC.App.946–47; R.Doc.1552, at 12–13. She claims no expertise in antitrust or economics and has no professional background in real estate. SWC.App.1058–70; R.Doc.1552, at 124–36. Her objection is the subject of Case No. 24-3585.

## F. Non-Class Member Realtors Attempting to Intervene (Doyle)

The final group opposing the NAR Settlement are not class members. Rather, they are NAR members. Doyle Br. 12.

The Doyle Realtors filed no objection. Instead, they waited until four days before the Final Approval Hearing and then moved to intervene. Doyle.App.154; R.Doc.1605. The District Court's denial of that motion is the subject of Case No. 24-3621.

## V. THE FAIRNESS HEARING AND FINAL APPROVAL

The District Court held a fairness hearing at which counsel made arguments for and against approval. Doyle.App.3; R.Doc.1622, at 2. For this hearing, the District Court ordered all objectors to appear in person. March.App.1332; R.Doc.1566. Spring Way Center and Wang complied

and personally appeared. Doyle.App.222, 234; R.Doc.1640, at 37, 49. The other objectors did not.

After considering the arguments and overruling all objections, the District Court found that each of the Rule 23(e)(2) factors, as well as this Court's *Van Horn* requirements, supported approval. Doyle.App.9–16; R.Doc.1622, at ¶¶17–32. The District Court also approved an attorneys' fee award of 1/3 of the settlement fund, along with repayment of the litigation expenses. Doyle.App.80–87; R.Doc.1622, at ¶¶171–86.

## SUMMARY OF THE ARGUMENT

After five hard years of litigating against many of the nation's top defense firms, and protracted negotiations conducted through a nationally known mediator and retired judges, Plaintiffs reached Settlements that significantly reform the residential real estate industry. The Settlements provide the Class with nearly $700 million, bringing the total recovery to over $1 billion. And importantly, the Settlements remove Defendants' anticompetitive rules, thereby saving home sellers billions more in the future.

Not surprisingly, almost all class members approve. Of the millions receiving notice, only 39 opted out and only 36 objected. By contrast, class

members have submitted claims for over two million transactions. The Objections, by contrast, were submitted largely by copycat law firms. None of their cases have advanced in any significant way, and none could offer the relief provided by the Settlements. Applying both Fed. R. Civ. P. 23(e)(2) and this Court's *Van Horn* factors, the District Court acted well within its discretion in overruling the Objections raised.

## ARGUMENT

## I.  STANDARD OF REVIEW

The decision to approve a class settlement is "committed to the sound discretion of the trial judge." *In re BankAmerica Corp. Sec. Litig.*, 350 F.3d 747, 752 (8th Cir. 2003) (internal quotation omitted). This Court gives a district court's views "great weight" because that court "is exposed to the litigants, and their strategies, positions and proofs," and "is aware of the expense and possible legal bars to success." *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 977 (8th Cir. 2018) (internal quotation omitted).

The District Court's award of attorneys' fees receives the same deference. The Court reviews the fee award for abuse of discretion, "giv[ing] substantial deference to a district court's determinations, in

light of the district court's superior understanding of the litigation." *Rawa v. Monsanto*, 934 F.3d 862, 870 (8th Cir. 2019) (internal quotation omitted).

## II. THE DISTRICT COURT PROPERLY CONSIDERED THE RULE 23(E)(2) AND *VAN HORN* FACTORS.

The standard for reviewing a class action settlement is whether it is "fair, reasonable, and adequate." *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1063 (8th Cir. 2013); Fed. R. Civ. P. 23(e)(2). The 2018 Amendments to Rule 23(e)(2) set forth factors to be considered, including the adequacy of representation, whether the settlements were negotiated at arm's length, whether the relief provided is adequate, and whether the settlement treats class members equitably relative to each other.

In addition, this Court requires district courts to analyze four so-called *Van Horn* factors: "'the merits of the plaintiff's case, weighed against the terms of the settlement; the defendant's financial condition; the complexity and expense of further litigation; and the amount of opposition to the settlement.'" *Huyer v. Njema*, 847 F.3d 934, 939 (8th Cir. 2017) (quoting *Van Horn v. Trickey*, 840 F.2d 604, 607 (8th Cir. 1988)). "Mindful of the limited scope of ... review," this Court confines its

analysis to determining "whether the District Court considered all relevant factors, whether it was significantly influenced by an irrelevant factor, and whether in weighing the factors it committed a clear error of judgment." *Marshall v. Nat'l Football League*, 787 F.3d 502, 508 (8th Cir. 2015) (internal quotation omitted).

## A. The Settlements Confer Great Benefits to the Class and Eliminate the Risk of Continued Litigation.

"'The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement.'" *Id.* (quoting *Van Horn*, 840 F.2d at 607). This factor weighed for approval because "the outcome of the litigation would be far from certain if the case had not settled, whereas the settlement provides substantial benefits to the class." *Keil v. Lopez*, 862 F.3d 685, 695 (8th Cir. 2017) (internal quotations omitted).

Even after Plaintiffs won the *Burnett* trial, they continued to face significant risk. Defendants attacked the verdict through post-trial motions and planned an aggressive appeal. Defendants would have petitioned for certiorari had that appeal failed. Defendants also could not pay even the *Burnett* judgment, which created more uncertainty. And the

parties still had to try *Moehrl* and litigate *Gibson*, with yet more appeals certain even if Plaintiffs prevailed.

"On the other side of the ledger, the settlement confer[red] substantial and immediate benefits to the class." *Id.* The NAR Settlement provided an immediate $418 million recovery, with an additional $30.6 million from opt-in MLSs and brokerages. Friedman.App.871; R.Doc.1595, at 20. The HomeServices Settlement provided another $250 million. *Id.* These amounts brought the total money relief from all settlements to over $1 billion. Friedman.App.871–72; R.Doc.1595, at 20–21. The Settlements also achieved injunctive relief that reshaped the residential real estate market by removing NAR's anticompetitive rules. Friedman.App.872–75; R.Doc.1595, at 21–24. "Weighing the uncertainty of relief against the immediate benefit[s] provided in the settlement[s]," the District Court acted well within its discretion in evaluating the strength of Plaintiffs' claims and the relief obtained. *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 933 (8th Cir. 2005).

**B.    The Settlements Extract the Most That Defendants Could Reasonably Be Expected to Pay and Remove the Risk of Insolvency.**

The District Court's approval was further buttressed by Defendants' inability to satisfy even the *Burnett* judgment, let alone judgments in other cases. As the District Court found, Plaintiffs thoroughly analyzed Defendants' ability to pay. Doyle.App.15; R.Doc.1622, at ¶29; Friedman.App.995; R.Doc.1595-1, at ¶20. Plaintiffs performed similar financial analyses on MLSs and brokerages opting into the settlement. *Id.* Using these analyses, Plaintiffs concluded they could obtain more for the class through settlement than through continued litigation. Based on this evidence, the District Court acted within its discretion in concluding that the settlement amounts were "reasonable in light of limitations on the Settling Defendants' ability to pay." Doyle.App.15; R.Doc.1622, at ¶29.

**C.    The Settlements Provide Immediate Benefits and Avoid the Complexity and Expense of Further Litigation.**

Class actions "place an enormous burden of costs and expense upon parties." *Marshall*, 787 F.3d at 512 (internal quotation omitted). This case was no exception. After over 100,000 hours of work and millions of dollars invested for case expenses, Plaintiffs' counsel achieved trial success in

*Burnett.* But even then the litigation was far from over. Defendants planned appeals (plus petitions for certiorari). At the same time, trial remained imminent in *Moehrl* and work continued in *Gibson.* As the District Court properly concluded, these facts favored settlement. Doyle.App.15; R.Doc.1622, at ¶30; *see also In re Wireless Tel.*, 396 F.3d at 933 (affirming settlement where the case would "likely drag on for years, require the expenditure of millions of dollars, all the while class members would receive nothing").

### D. Class Reaction to the Settlements Is Overwhelmingly Positive.

That objections "are small in number" favors approval because it "speaks well of class reaction to the Settlement." *Keil v. Lopez*, 862 F.3d 685, 698 (8th Cir. 2017). Here, the "amount of opposition [was] minuscule when compared with other settlements that [this Court has] approved." *Id.* Only 36 class members objected out of a Class of many millions. *Compare DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1174, 1178 (8th Cir. 1995) (where five class members objected out of a class of 300,000, "[t]he fact that only a handful of class members objected to the settlement similarly weighs in its favor."); *see also In re Wireless Tel.*, 396 F.3d at 933 (opposition treated as "minuscule" when objection rate fell "well

below ... four percent"). The District Court properly recognized its "duty to the silent majority as well as the vocal minority" in concluding that the small amount of opposition favored approval. *Marshall*, 787 F.3d at 513.

### E. Every Rule 23(e)(2) Factor Favors Approval.

Fed. R. Civ. P. 23(e)(2) also sets forth factors to be considered when determining whether a settlement is fair, reasonable, and adequate. The District Court considered and weighed each of these factors in approving the Settlements.

First, the District Court applied Rule 23(e)(2)(A) by finding adequate representation. Doyle.App.10–11; R.Doc.1622, at ¶21. In determining adequacy of representation, courts consider such factors as "counsel's experience, vigorous advocacy over the course of the litigation, and diligent efforts to obtain discovery and engage expert witnesses." *In re Blue Cross Blue Shield Antitrust Litig. MDL 2406*, 85 F.4th 1070, 1093 (11th Cir. 2023). The District Court found these factors satisfied based on its intimate familiarity with the conduct of both Class Counsel and the Class Representatives through more than five years of litigation. This included witnessing a full trial and record-breaking verdict for the Class.

Second, the District Court applied Rule 23(e)(2)(B) by finding that the Settlements were negotiated at arm's length. Doyle.App.11; R.Doc.1622, at ¶22. The settlement negotiations were conducted over several years with the aid of a nationally known antitrust expert and two federal judges. They "were contentious and hard fought," *id.*, and there was no suggestion the Settlements were "the product of fraud or collusion." *Marshall*, 787 F.3d at 509.

Third, the District Court applied Rule 23(e)(2)(C) by finding the relief provided was adequate. Doyle.App.11–12; R.Doc.1622, at ¶23. The Settlements provide almost $700 million in recovery, as well as significant practice changes. Doyle.App.12; R.Doc.1622, at ¶24. In addition, the District Court considered the risks of continued litigation and appeal, along with Defendants' inability to pay the full judgment amount even if Plaintiffs prevailed on appeal. Doyle.App.11–12; R.Doc.1622, at ¶23. The District Court also found that the Settlement Administrator has extensive experience in distributing relief in large and complex class action settlements. Doyle.App.13; R.Doc.1622, at ¶25. And it approved the attorneys' fee requested. *Id.*

Fourth, the District Court applied Rule 23(e)(2)(D) by finding that the Settlements treat class members equitably relative to each other. Doyle.App.13; R.Doc.1622, at ¶26. The practice change relief applies the same to all. And the monetary recovery for each class member will reflect the commissions paid, with reduction on a pro rata basis if the value of claims submitted exceeds the proceeds available. *Id.*

## III. THE DISTRICT COURT PROPERLY OVERRULED THE MULLIS OBJECTION.

The Mullis Objection seeks to carve out indirect purchaser buyer claims of individuals who are members of the class because of their home sales. Every class member sold a home during the class period, and most also bought homes – including most of the named Plaintiffs. Thus, most class members had possible claims both as home sellers and home buyers. But Defendants wouldn't pay almost all their cash in settlement "only to have many of the same people they just paid sue them again for the same alleged antitrust conspiracy." Doyle.App.60; R.Doc.1622, at ¶127. Plaintiffs thus reasonably concluded that the best possible result for the class was to achieve historic Settlements by releasing class members' claims as both sellers and buyers.

To be clear, the releases apply only to people who accept benefits under the Settlements. Every class member can make a choice. If they choose to accept benefits under the Settlements, then they release all claims, including indirect purchaser buyer claims. Or they can opt out and pursue buyer claims either individually or in *Batton*. People with buyer-only claims are unaffected because they are not part of the Class. Contrary to Mullis's arguments, there are no conflicts: any class member with a released buyer claim necessarily also has a seller claim, and they are receiving the benefits of the Settlements because of both.

## A.    The Settlements Treat Class Members Equitably Relative to Each Other.

Rule 23(e)(2)(D) looks to whether a settlement proposal "treats class members equitably relative to each other." Because settlements are ongoing, the District Court deferred approving an allocation plan. Doyle.App.38; R.Doc.1622, at ¶76. But it made clear that the settlement proceeds "will be distributed equitably and reduced on a pro rata basis." *Id*. This is the most common method for allocating settlement funds in antitrust cases. *In re Namenda Direct Purchaser Antitrust Litig.*, 462 F.Supp.3d 307, 316 (S.D.N.Y. 2020) ("courts uniformly approve as equitable" plans in antitrust cases that "allocate[] funds among class

members on a pro rata basis."); *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) (approving pro rata distribution as fair and reasonable).

Mullis argues that delaying the allocation plan is impermissible "punting" of the Rule 23(e)(2) analysis. Mullis Br. 27. Not so. The "prime function" of a fairness hearing is "to determine that the amount paid is commensurate with the value of the case." *In re Agent Orange Prod. Liab. Litig.*, 818 F.2d 145, 170 (2d. Cir. 1987). And this "can be done before a distribution scheme has been adopted so long as the distribution scheme does not affect the obligations of the defendants under the settlement agreement." *Id.* Nor is Mullis correct in arguing that the 2018 amendments to Rule 23(e) changed this longstanding practice. Courts evaluated class settlements in terms of "intraclass equity" long before 2018. *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 863 (1999) (discussing "the requirement of intraclass equity"). And courts continue to approve delaying allocation plans even after the 2018 amendments. *In re Domestic Airline Travel Antitrust Litig.*, 378 F. Supp. 3d 10, 22 (D.D.C. 2019).

This Court's standard is clear: class members need not be provided "a formula for calculating individual awards" before settlement approval. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1153 (8th Cir. 1999). A description of the "potential aggregate payout" is enough. *Id*. The District Court provided that information, and any class members who wish to receive a larger share of the settlement proceeds based on home purchases will be able to make that argument to the District Court during the allocation phase.

## B. The Settlements Properly Release All Claims Arising from the Same Factual Predicate.

For class settlements, this Court gives preclusive effect to all claims – even those not pleaded – that "arise out of the same factual predicate" as the pleaded claims. *In re Uponor, Inc., F1807 Plumbing Fittings Prods. Liab. Litig.*, 716 F.3d 1057, 1065 (8th Cir. 2013). The parties crafted the settlement releases to conform with *Uponor*'s standard. To begin, each Settlement limits the term "Released Claims" to include only causes of action "arising from or relating to conduct that was alleged or could have been alleged in the Actions based on any or all of the same factual predicates for the claims alleged in the Actions[.]" March.App.366–67; R.Doc.1458-1, at ¶17; SWC.App.529; R.Doc.1518-1, at ¶13. In addition,

"[f]or avoidance of doubt" as to enforceability, the releases "extend[] to, but only to, the fullest extent permitted by law." March.App.377–78; R.Doc.1458-1, at ¶34; SWC.App.534–35; R.Doc.1518-1, at ¶29. As Mullis admits, using these legal terms of art incorporates the Court's same factual predicate standard into the releases. Mullis Br. 45.

Mullis argues that even claims based on identical misconduct cannot be released so long as a single fact varies between the two claims. Mullis Br. 31. This Court has never applied the same factual predicate standard so narrowly. Under this Court's cases, a class settlement may release all claims held by class members so long as "there is a realistic identity of issues between the settled class action" and the released claims. *Thompson v. Edward D. Jones & Co.*, 992 F.2d 187, 191 (8th Cir. 1993) (internal quotation omitted). And the released claims need only "rest on the same or similar facts as the class action claims." *Id.* at 191 n.6; *accord In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 803 (8th Cir. 2004) (applying *Thompson* to uphold a "broad" release of claims "on the basis of, connected with, or arising out of, or related to, in whole or in part, the Policies and the Released Transactions"); *Uponor*,

716 F.3d at 1065 (upholding release of all claims related "to leaky brass fittings," regardless of theory or damages claimed).

Mullis's attempt to distinguish *Thompson* and *General American* as not applying to "separate transactions" is unpersuasive. Mullis Br. 36–38. Both cases approve the release of claims that "rest on the same ***or similar*** facts as the class action claims," so long as "there is a realistic identity of issues." *Thompson*, 992 F.2d at 191 n.6 (emphasis added); *General Am.*, 357 F.3d at 804–05. In fact, *General American* rejected the very claim Mullis makes here: that the class representatives "gave away" supposedly valuable alternative claims for "nothing." *General Am.*, 357 F.3d at 805. As the Court made clear, such arguments ignore "the way settlements usually work" through a natural give-and-take process. *Id.* Each side provides the other "a series of benefits" and "[n]o part of the consideration on either side is keyed to any specific part of the consideration of the other." *Id.* The crucial point is that class members receive adequate notice of what's being released, so they can decide whether to accept the settlement benefits or opt out. *Id.* at 804. And the class members received such notice here.

Nor can Mullis overcome *Thompson* and *General American* by relying on dicta from *Nat'l Super Spuds, Inc. v. New York Mercantile Exch.*, 660 F.2d 9 (2d Cir. 1981). Aside from being out-of-circuit, *Super Spuds* also "hinged on the fact that the class representatives did not possess" all claims they released. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 111 (2d Cir. 2005). Named Plaintiffs here both bought and sold homes during the class period. In addition, the settlement in *Super Spuds* "enlarged the scope of the claims to be released without giving notice to the class members." *General Am.*, 357 F.3d at 805. The class notice here, by contrast, warned that class members were releasing all causes of action they may have had "in connection with the sale of any residential home (including claims as a seller, buyer, or otherwise[.]" March.App.524; R.Doc.1519-1, at 10. Class members were also expressly advised that their claims against NAR and HomeServices in *Batton* (and certain other cases) might be released. March.App.524–29; R.Doc. 1519-1, at 10–15. That's even more specific than the broad notice approved in *Thompson* and *General American* (but which was lacking in *Super Spuds*).

## C. The Class Representatives and Their Counsel Provided Adequate Representation.

Mullis claims that the possibility of some class members alleging indirect purchaser buyer claims presents an intractable conflict between "competing groups within [the] class." Mullis Br. 40. But "[t]he interests of the various plaintiffs do not have to be identical to the interests of every class member; it is enough that they share common objectives and legal or factual positions." *Petrovic*, 200 F.3d at 1148 (internal quotation omitted). Here, all class members "share [the] common objective" of ending Defendants' conspiracy and recovering excessive commissions they paid as a result. *Id.*

Mullis's conflict argument also ignores the fact that individuals who sold homes during the class period are the sole people included in the settlements. March.App.373; R.Doc.1458-1, at ¶21; SWC.App.530–31; R.Doc.1518-1, at ¶17. Those who only bought homes are not class members. Such "buyer only" individuals have released nothing and can litigate indirect purchaser buyer claims however they desire, whether individually or in *Batton*. *Batton* itself will continue to be litigated. The sole limitation imposed is that people who accept settlement benefits here are required to release all their claims arising from the same

anticompetitive conduct of Defendants. This is not a case where anyone is releasing claims without compensation.

For these reasons, Mullis's reliance on *Literary Works* misses the mark. *Literary Works* involved a settlement that placed claims in groups A, B, and C. *In re Literary Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 246 (2d Cir. 2011). If claims exceeded a set cap, then Category C claims would be reduced first and could be eliminated. *Id.* The Second Circuit therefore found a lack of adequate representation "because the reduction of Category C claims could deplete the recovery of Category C-only plaintiffs in their entirety before the Category A or B recovery would be affected." *In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1277 (11th Cir. 2021) (citing *In re Literary Works*). The Settlements here, by contrast, present "no risk that any members of the class will have their ability to get settlement benefits reduced to zero because some other members got more relief from the settlement." *Id.* Instead, "all class members are entitled to the same class benefits." *Id.*

Mullis also relies on *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591 (1997), and *Ortiz v. Fibreboard Corp.*, 527 U.S. 815 (1999). But those cases involved far different facts. *Amchem* and *Ortiz* represented

attempts to settle all asbestos cases. The "injuries involved in those cases were extraordinarily various, both in terms of the harm sustained and the duration endured." *Petrovic*, 200 F.3d at 1146. Worse yet, the diseases had a long latency period, meaning that many class members currently suffered from no illness. *In re Target Corp.*, 892 F.3d at 975. This latency period created an inherent conflict "between class members who already had asbestos-related injuries (and who would want to maximize immediate payout) and class members who might develop asbestos-related injuries in the future (and who would want to maximize testing, protection from inflation, and future fund size)." *Petrovic*, 200 F.3d at 1146. Adding to the problem, "the settlement offered no assurance that sufficient funds would remain to protect the interests" of future claimants. *In re Target Corp.*, 892 F.3d at 975. In other words, both *Amchem* and *Ortiz* involved a strong likelihood that some claimants would be paid, but others (numbering in the hundreds of thousands) would receive nothing. That concern is not present here, where every class member sold a home and thus is entitled to compensation. The settlements leave no class members out.

## IV. THE DISTRICT COURT PROPERLY OVERRULED THE MARCH AND FRIEDMAN OBJECTIONS.

March and Friedman object to the NAR Settlement's release of opt-in brokerages Brown Harris Stevens and The Agency,[3] along with small NAR member brokerages that are also REBNY members. The District Court correctly overruled these objections.

### A. Objectors' Claims Arise from the Same Factual Predicate as Plaintiffs' Claims.

As discussed (and as March and Friedman acknowledge), the NAR Settlement may appropriately release all claims that "arise out of the same factual predicate" as the pleaded claims. *Uponor,* 716 F.3d at 1065; *see also* Friedman Br. 18; March Br. 43. The District Court correctly applied this standard. Plaintiffs pled a *nationwide* conspiracy predicated on NAR and non-NAR MLS rules alike. Doyle.App.7–8; R.Doc.1622, at ¶14. The New York Objectors made judicial admissions that the NAR and REBNY rules are related. Doyle.App.55; R.Doc.1622, at ¶116. Evidence from both *Burnett* and *Moehrl* tied the NAR and

---

[3] Even if the Court were to disapprove the NAR Settlement's inclusion and release of opt-in brokerages, that would not require reversing approval of the NAR Settlement itself. March.App.403; R.Doc.1458-1, at ¶80 (severability provision).

REBNY rules together. Doyle.App.55–57; R.Doc.1622, at ¶¶117–18. And the only parties released are those who have a NAR affiliation and so are necessarily part of the NAR conspiracy. Doyle.App.54; R.Doc.1622, at ¶112. All of the District Court's findings are supported by the record and none constitute any abuse of discretion.

To start, Plaintiffs' *Gibson* Complaint expressly alleges an anticompetitive agreement encompassing REBNY. Doyle.App.54; R.Doc.1622, at ¶113. Thus, *Gibson* squarely places REBNY's rules at issue and shares a clear "factual predicate" with other claims challenging those same REBNY rules.

Equally true, the NAR Settlement releases only NAR member brokerages and certain of their affiliates. March.App.367–71; R.Doc.1458-1, at 14–18. These released brokerages are bound to follow NAR's rules, including several challenged in *Burnett*, *Gibson*, and *Moehrl*. Brokerages unaffiliated with NAR receive no release. Nor is REBNY itself released. The New York Objectors are free to continue pursuing claims against REBNY and its non-NAR members, regardless of the NAR Settlement.

The record also belies Objectors' claims that the NAR and REBNY rules are "wholly unrelated" such that they share "no common discovery." Friedman Br. 43; March Br. 38. In fact, Plaintiffs supplied the District Court with broad evidence about REBNY, including expert reports analyzing REBNY and its rules. Doyle.App.55–57; R.Doc.1622, at ¶117. This evidence showed that the challenged NAR rules applied to NAR member brokerages and agents nationwide, including their transactions on REBNY's listing service. *Id.* It also showed that MLSs like REBNY are controlled by many of the same brokerage companies responsible for adopting and implementing the challenged NAR rules. Burnett.App.164–65; R.Doc.922-3, at ¶87.[4]

Even a cursory examination of the REBNY rule shows that it imposed a functionally identical restraint as NAR's rule. Like the NAR rule, the REBNY rule "required listings to include an offer of buyer-broker compensation" for all sales to buyers "represented by buyer-brokers." Doyle.App.55–57; R.Doc.1622, at ¶117. Moreover, the REBNY

---

[4] Objectors try to dismiss Plaintiffs' expert opinions as showing no "connection between NAR and REBNY." Friedman. Br. 33. But the very reason Plaintiffs' experts addressed REBNY was to show that its listing service made a poor "but for" benchmark because REBNY was part of the same conspiracy as NAR.

rule discouraged commission negotiation just like the NAR rule. Burnett.App.157; R.Doc.922-3, at ¶67 ("These rules, which are mandatory for all participants ... effectively serve the same purpose as the [NAR] [r]ule."). And Realtors are bound to follow the NAR rules wherever they operate, including New York. Doyle.App.55–57; R.Doc.1622, at ¶117. For these reasons, Plaintiffs' experts concluded that the rules perform the same function in the same manner. *Id.*

The New York Objectors try to ignore these facts by arguing that "REBNY has been totally separate from NAR since 1994." March Br. 4; Friedman Br. 5. But NAR first adopted its Buyer Broker Commission rule in 1992, before the split. Burnett.App.256; R.Doc.1382, at 24 ("NAR policy changes" resulted in NAR "modif[ying] the rule that existed prior to 1992"). And NAR employed similar anticompetitive schemes for decades before that. Real estate brokers openly fixed commissions through fee schedules until the Supreme Court condemned that practice in 1950. *United States v. Nat'l Ass'n of Real Est. Bds.*, 339 U.S. 485 (1950). NAR then pushed for advisory commission schedules, until the DOJ successfully enjoined the practice. *See, e.g., United States v. Atlanta Real Est. Bd.*, 1972 WL 516 (N.D. Ga. Feb. 4, 1972). By the 1990s, NAR was

grappling with the subagency system and adopted the Buyer Broker Commission Rule to maintain those inflated commission splits. Burnett.App.26–29; R.Doc.582, at 23–26. REBNY, because of its decades-long interrelationship with NAR, was part of all this. That's why the REBNY rules so closely track NAR's rules.

The New York Objectors admitted the close relationship between the REBNY and NAR rules in their complaints. March's complaint states that NAR's rules were, "in effect, the same rule as REBNY that mandates the payment of a commission by a Seller Broker to a Buyer Broker." March.App.701; R.Doc.1562-2, at ¶94. The complaint then discusses NAR's anticompetitive rules, the prior litigation challenging those rules, and the close relationship of both to REBNY's rules. March.App.703–09; R.Doc.1562-2, at ¶¶99–127. Friedman's original complaint did the same. Doyle.App.55; R.Doc.1622, at ¶116. The District Court properly held March and Friedman bound by these judicial admissions.

In addition to ignoring the operative facts, the New York Objectors also largely ignore the governing law. As discussed in Section II.B, the same factual predicate standard is governed by this Court's decisions in *Thompson* and *General American*. But Friedman addresses neither case,

and March cites only *Thompson* (and only in passing).[5] In any event, both decisions show that the NAR Settlement properly includes claims for inflated commissions paid on REBNY transactions. Such claims not only "could have been averred" by Plaintiffs – they were actually pled in *Gibson*. *General Am.*, 357 F.3d at 803; Doyle.App.54; R.Doc.1622, at ¶113.

Likewise, REBNY claims "rest on the same or similar facts" as the NAR claims. *Thompson*, 992 F.2d at 190 n.6. Proof of the conspiracy's impact on REBNY transactions differs in no meaningful way from sales on all the other MLSs. Nor does the mere fact that this evidence comes from several geographic regions mean there were multiple conspiracies. The litigation class certified in *Moehrl* included 20 MLSs covering 19 states and Washington D.C., but all these geographic areas were part of

---

[5] In place of *Thompson* and *General American*, Friedman proposes a different standard: whether "the claims arise out of the same nucleus of operative facts." Friedman Br. 19. Even if the Court were to adopt this standard, the NAR Settlement would satisfy it because of the close factual connection between the claims asserted in the New York suits and the claims in *Burnett*, *Gibson*, and *Moehrl*. 13D Wright & Miller, Federal Practice & Procedure § 3567.1 (3d ed. 2005) ("common nucleus" test is "broader than the 'transaction or occurrence' test" and requires only that two sets of claims "have some loose factual connection").

the same alleged conspiracy. *Murphy v. Jones*, 877 F.2d 682, 685 (8th Cir. 1989) (same factual predicate found where claims involved "virtually identical" injury and "proof of very similar actions" by the defendants).[6]

## B. March and Friedman's Other Objections Also Lack Merit.

March and Friedman also briefly raise a hodgepodge of miscellaneous objections. For instance, they claim the District Court disregarded Rule 23(e)(2). That's not correct, for the reasons discussed in Section I.E. Friedman also claims the District Court ignored his "standing" argument (raised below only superficially in a bullet-pointed list). But that's just a repackaged "same factual predicate" argument properly rejected for the reasons above. And Plaintiffs demonstrated the adequacy of the monetary relief. By including REBNY transactions in the

---

[6] Like Mullis, the New York Objectors rely heavily on out-of-circuit dicta from *Super Spuds*. That argument fails for the reasons discussed in Section II.B. Their other cases each turned on business practices presenting differences not found here. *See Hesse v. Sprint Corp.*, 598 F.3d 581, 591 (9th Cir. 2010) (claims based on "different surcharges, imposed to recoup different costs, that were alleged to be improper for different reasons"); *Dennis v. JPMorgan Chase & Co.*, No. 16-cv-6496, 2021 WL 1893988, at *5–6 (S.D.N.Y. May 11, 2021) (manipulation of "separate and unrelated" financial benchmarks, with no allegations "suggesting that there is any overlap"); *In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 119 (S.D.N.Y. 2010) (practices that "bear no transactional relationship" to previously released conduct).

Settlement Class, New York home sellers are able to make claims on a fund valued at more than $1 billion. Excluding REBNY class members would have left them worse off. Finally, Objectors' remaining complaints about allocation are premature. All class members submitting claims, including Objectors, can later be heard regarding the allocation plan.

## V. THE DISTRICT COURT PROPERLY OVERRULED THE MONESTIER OBJECTION.

The Monestier Objection raises three additional issues: (1) Plaintiffs' standing to obtain practice changees; (2) the adequacy of the Settlements' practice changes; and (3) the reasonableness of the District Court's award of attorneys' fees. None of her objections have merit.

### A. Plaintiffs Have Standing to Obtain Practice Changes.

As discussed, the Settlements eliminate Defendants' challenged practices and will thereby save the Class billions by lowering commissions for future home sales. Monestier objects to this result, arguing the Class Representatives lack standing. Monestier Br. 22. That's not correct. Although no one (including Monestier) questioned standing below, the record makes plain that Defendants' challenged practices "require *every* seller to offer compensation" to a buyer broker. Burnett.App.116; R.Doc.741, at 28. The harm that flows from that

requirement is "pronounced and unavoidable," and it will persist until remedied. Burnett.App.47; R.Doc.637-4, at ¶13.

Victims of illegal conduct may seek injunctive relief when they suffer "continuing, present adverse effects," *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974), or likely "will again be wronged in a similar way." *City of Los Angeles v. Lyons*, 461 U.S. 95, 111 (1983). The standard is not certainty, but whether there is a "substantial risk that the harm will occur" rather than a mere "possibility" of injury. *City of Kennett, Missouri v. Env't Protection Agency*, 887 F.3d 424, 431 (8th Cir. 2018). "Past wrongs" provide direct evidence of such risk. *O'Shea v. Littleton*, 414 U.S. 488, 496 (1974).

Here, there is no serious dispute. Plaintiffs have shown "actual repeated incidents" of harm resulting from Defendants' "concrete and consistently implemented policies," and the possibility of recurring harm has "cease[d] to be speculative." *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 826 (9th Cir. 2020); *In re Navy Chaplaincy*, 697 F.2d 1171, 1176–77 (D.C. Cir. 2012). Because Plaintiffs are not just home sellers but also ***homeowners***, they will inevitably sell their current homes. Burnett.App.3; R.Doc. 553-6, at 30:14–21; Burnett.App.221;

R.Doc. 1324, at 271:7–11; Burnett.App.222; R.Doc.1324, at 337:5–18. As Monestier herself concedes, "[h]ome sales occur, on average, once every twelve years." Monestier Br. 23.[7] And "Defendants and their co-conspirators collectively have 100% market share in the relevant antitrust markets." Burnett.App.143; R.Doc.922-3, at ¶27. Absent the practice changes, when Plaintiffs sell again they would have no real alternative but to list on an MLS and pay the inflated commissions dictated by the challenged practices. Burnett.App.226–27; R.Doc.1325, at 530:17–531:1; Burnett.App.231–32; R.Doc.1326, at 722:12–723:15. That harm is concrete, particularized, and certain – more than sufficient to establish standing.[8]

Monestier's argument also fails because the practice changes arise from a private settlement contract, not traditional judicially ordered injunctive relief. A "class action agreement" is merely "a private contract"

---

[7] Hollee Ellis, for example, sold her home and bought a new one in 2020, a year after this case was filed. Burnett.App.222; R.Doc.1324, at 337:5–18.

[8] If the Court has any doubts regarding the issue, Plaintiffs request the opportunity to provide supplemental evidence establishing standing. *Center for Biological Diversity v. Strommen*, 114 F.4th 939, 943 n.3 (8th Cir. 2024); *Worth v. Jacobson*, 108 F.4th 677, 686 (8th Cir. 2024).

the court approves without "establish[ing] a judicial 'imprimatur'" over "the terms of the agreement." *Christina A. ex rel. Jennifer A. v. Bloomberg*, 315 F.3d 990, 992 (8th Cir. 2003). And it is well established that settlements may include relief the court itself would have no jurisdiction to award. *See, e.g.*, *Matsushita Elec. Indus. Co., Ltd. v. Epstein*, 516 U.S. 367, 385 (1996) (state courts may approve settlements that release claims subject to exclusive federal court jurisdiction). Because the District Court undisputedly had "jurisdiction over the dispute," it had authority to "approve [the] proposed class settlement" without raising Article III concerns. *Frank v. Gaos*, 586 U.S. 485, 492 (2019).

Monestier addresses none of this. Instead, she relies largely on *Davis v. Hanna Holdings, Inc.*, 771 F.Supp.3d 552, 567–68 (E.D. Penn. 2025), where the court denied standing to a group of home **buyers**. But the difference is obvious: future harm is more speculative for buyers than sellers. Every homeowner will eventually sell. Many people, by contrast, go their entire lives without buying any home, and buying one home doesn't imply any future purchases.

Monestier further argues that Plaintiffs lack standing because any class member who lists their home on a NAR MLS suffers only "self-inflicted harm" that is "largely of [their] own making." Monestier Br. 27–28. But home sellers can't avoid NAR's challenged practices even if they want to. The practices "eliminate the ability to negotiate commissions" by "requir[ing] anyone listing a property on an MLS to offer compensation to buyers' brokers." Burnett.App.204–05; R.Doc.956, at 25, 26. Owners trying to sell their home without using an MLS suffer from "steering," where agents refuse to show their homes to prospective buyers. *Id.* Home sellers therefore "have no realistic choice" but to list on an MLS, and "[a]ll attempts to break the link [with] MLSs have been unsuccessful." *Id.* Absent the Settlements, no class member can change this system (or avoid being harmed by it); each therefore suffers a cognizable injury conferring standing to seek a remedy.

## B.   Eliminating the Challenged Practices Benefits the Class.

The District Court also properly exercised its discretion in rejecting Monestier's attempts to second-guess the practice changes secured. As the District Court found, Plaintiffs' counsel "have extensive antitrust experience and have developed knowledge of the real estate industry

based on a half-decade's worth of detailed factual and expert discovery and research." Doyle.App.24; R.Doc.1622, at ¶46. Drawing on that experience and knowledge, they developed the settlement and practice changes "in consultation with economic and real estate industry experts." *Id*. And the District Court evaluated the practice changes based not only on the expert analysis, but also its own knowledge gained through five-plus years of overseeing the case, including a full-blown trial on the merits.

While Monestier believes the practice changes don't go far enough, other objectors believed the opposite. SWC.App.440; R.Doc.1510; SWC.App.2795; R.Doc.1564; Friedman.App.1328–29; R.Doc.1597, at 10–11. Such give-and-take is normal: "a settlement is a product of compromise and the fact that a settlement provides only a portion of the potential recovery does not make such settlement unfair, unreasonable or inadequate." *Keil v. Lopez*, 862 F.3d 685, 696 (8th Cir. 2017). Monestier's criticisms also ignore two crucial facts. First, in drafting the Settlements counsel was limited by "the scope of the federal antitrust laws" and the scope of federal injunctive authority. Doyle.App.26–27; R.Doc.1622, at ¶51. Monestier might want to address

"every act of misconduct that might arise in the real estate industry," but that lies beyond the Court's power. *Id.* And second, Monestier offers no realistic alternative. If the Court were to disapprove the Settlements, the result would be "reverting to rules that a jury determined violate federal antitrust law." *Id.* Monestier may quibble about particular settlement language, but she can offer nothing remotely as beneficial as eliminating Defendants' challenged practices.

Monestier claims the District Court failed to provide a "reasoned response" to her arguments. Monestier Br. 41. That's not correct. Monestier submitted 122 pages of objections, single-spaced. The District Court, in turn, devoted 10 pages of its Order to considering and overruling Monestier's objections. Doyle.App.22–31; R.Doc.1622, at ¶¶43–60. Nothing more was required – the District Court didn't owe Monestier a line-by-line refutation. *Babu v. Wilkins*, No. 22-15275, 2023 WL 6532647, at *3 (9th Cir. Oct. 6, 2023) ("brief" responses "at a high level of generality" sufficient so long as the district court "provide[s] its reasoning" and does "not dismiss the objections out-of-hand").

Turning to Monestier's specific claims, she never argued below that the Settlements benefit only "consumers" rather than class members.

Monestier Br. 39. That issue thus is untimely and waived. *Int'l Bhd. of Elec. Workers, Loc. Union No. 545 v. Hope Elec. Corp.*, 380 F.3d 1084, 1096 (8th Cir. 2004). Nor would Monestier's argument have merit anyway. As discussed, class members are not just home sellers, but also homeowners who may sell homes in the future. Each cannot sell their current homes without facing the challenged practices and, absent the practice changes, they will suffer harm when they sell their homes. The Settlements remedy these problems and thus greatly benefit class members.

Monestier next complains that the Settlements "still allow advance offers of compensation" off MLSs. Monestier Br. 43. But the purpose of the antitrust laws is to "preserve the free market opportunities of buyers and sellers," not to stifle freedom to contract by forbidding specific negotiations altogether. *Eichorn v. AT&T Corp.*, 248 F.3d 131, 141 (3d Cir. 2001) (internal quotation omitted). It's questionable whether an injunction prohibiting all seller offers of compensation would even be permissible. It would likely require enjoining millions of individual real estate agents (and possibly their clients) who were not parties to the Settlements or litigation. The Settlements eliminate Defendants'

mandatory rule while preserving the rights of individual home sellers and buyers.

The District Court also properly rejected Monestier's argument about supposed Realtor "workarounds" to the settlement terms. Monestier Br. 46. Defendants maintained their challenged practices for more than three decades, and Plaintiffs presented expert evidence that "it will take time for the full impact of the practice changes to be reflected in real estate industry pricing and practices." Friedman.App.904; R.Doc.1595, at 53. No one expects the industry to transform overnight. Still, Plaintiffs also presented evidence that the changes have begun, with "a drop of 68 basis points" in average commission rates reported already. Friedman.App.903; R.Doc.1595, at 52. Monestier's anecdotal reports of individual Realtor confusion or violations in the first few months of a completely new system are "neither surprising, nor a basis for rejecting" the Settlements. Doyle.App.25; R.Doc.1622, at ¶48. And, as the District Court noted, the best way to address any purported violations is to "facilitate enforcement" by approving the Settlements. Doyle.App.24–25; R.Doc.1622, at ¶47.

Monestier further argues that enforcement of the Settlements is "illusory" and "largely delegated to NAR itself." Monestier Br. 50. That's not true either. As Monestier admits, Plaintiffs' counsel has the right to demand proof of compliance – counsel has already been pursuing that enforcement mechanism. Burnett.App.299; R.Doc.1699, at 2. Her suggestion that Counsel has "no incentive to pursue enforcement" also overlooks "Counsel's vigorous prosecution of this litigation for half a decade." Doyle.App.24; R.Doc.1622, at ¶45. The District Court likewise retains jurisdiction to enforce the settlement. Doyle.App.22–24; R.Doc.1622, at ¶44; March.App.404; R.Doc.1458-1, at ¶82. And if Monestier (or any other class member) believes a Realtor is evading the settlement, she is free to take action because agents, brokerages, and MLSs who do not comply with the practice changes are not released parties. March.App.367–71; R.Doc.1458-1, at ¶18(b)–(f).

Monestier further claims the District Court "ignor[ed]" a Statement of Interest filed by the DOJ. Monestier Br. 52. To start, a Statement of Interest filed under 28 U.S.C. § 517 is not an objection, it's "rather like an *amicus curiae*." *United States v. Realpage, Inc.*, No. 1:24CV710, 2024 WL 5186598, at *2 n.2 (M.D.N.C. Dec. 20, 2024). Nor did the District

Court "ignore[e]" the DOJ. The DOJ monitored this case from the start and offered no objections to the Settlements. To the contrary, the DOJ attended the final approval hearing and had a lengthy dialogue with the Court. During this colloquy, the DOJ confirmed it was not objecting to the Settlement but merely wished to preserve its right to take additional action against NAR. Doyle.App.206–11; R.Doc.1640, at 21–26. And Plaintiffs provided assurances that "the Settlement does not limit its ability to enforce the antitrust laws, including its ability to seek relief in a future enforcement action." Burnett.App.292; R.Doc.1613, at 2. The District Court therefore had nothing to rule on because the parties were in agreement.

### C. The Attorneys' Fees Award Falls Squarely within the Range Approved as Reasonable.

Lastly, Monestier objects to the District Court's attorneys' fees award. Monestier Br. 54. Courts use two approaches in analyzing a request for attorneys' fees – lodestar and percentage-of-the-benefit. *Keil*, 862 F.3d at 701. The percentage approach is recommended for common fund situations like this, *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 245 (8th Cir. 1996), and that's what the District Court chose. As for the percentage, the District Court found one-third reasonable. Doyle.App.80–

87; R.Doc.1622, at ¶¶171–85. That percentage is well within the range of permissible awards approved by this Court. *Huyer v. Buckley*, 849 F.3d 395, 399 (8th Cir. 2017) (one-third award is "in line with other awards in the Eighth Circuit"). Indeed, courts within the Eighth Circuit "have frequently awarded attorneys' fees ranging up to 36% in class actions." *Id.*; *see also In re U.S. Bancorp Litig.*, 291 F.3d 1035, 1038 (8th Cir. 2002) ("we find no abuse of discretion in the district court's awarding 36% to class counsel who obtained significant monetary relief on behalf of the class"); *Rawa v. Monsanto Co.*, 934 F.3d 862, 870 (8th Cir. 2019) (quoting same).[9]

The record fully supports the District Court's one-third fee award. This Court evaluates an award's reasonableness using 12 so-called *Johnson* factors. *In re Target Corp. Customer Data Sec. Breach Litig.*, 892 F.3d 968, 977 (8th Cir. 2018). Plaintiffs provided unrebutted evidence detailing how each *Johnson* factor supports the one-third fee awarded. SWC.App.672–94; R.Doc.1535-1, at ¶¶37–78. Relying both on this

---

[9] Nor does a large recovery require a lower percentage. *In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849, 860 (8th Cir. 2024) ("we decline to hold that a court must award a reduced percentage in megafund cases.").

evidence and its own knowledge, the District Court found the one-third award justified because Class Counsel: (1) "developed this case without a government suit"; (2) "pursued this litigation on their own for more than five years, expending a tremendous amount of time and money in the process"; (3) "took the risk of litigating the case through a jury verdict"; and (4) "obtained one of the largest antitrust jury verdicts in United States history." Doyle.App.30; R.Doc.1622, at ¶58. The District Court concluded, "this is exactly the kind of case where an award at the highest percentage is appropriate." *Id*. Having overseen the case for five years, the District Court acted firmly within its discretion in making these findings.

Out of an abundance of caution, the District Court also performed a lodestar cross-check. Although not required, this method can be used to "double-check" the reasonableness of a fee. *Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1157 (8th Cir. 1999). Based on the 107,500 hours of time expended (times normal billing rates) the cross-check multiplier was 3.62. SWC.App.718; R.Doc.1535-1, at 77; Doyle.App.86–87; R.Doc.1622, at ¶184. This multiplier lies well within the range approved in this and other circuits. *Rawa*, 934 F.3d at 870 (lodestar multiplier of 5.3 "does not

exceed the bounds of reasonableness"); *Huyer*, 849 F.3d at 400 (courts within the Eighth Circuit approve multipliers as high as 5.6). Just last year this Court cited with approval a similar multiplier of 3.5 "given that counsel had risked several years on a case that would yield them nothing had they lost at trial." *T-Mobile*, 111 F.4th at 862.

Monestier ignores all of this. Instead, she argues the District Court "failed to properly consider the degree of success obtained" in making its award. Monestier Br. 55. But the District Court specifically found that both the "level of work" and "result achieved" were "extraordinary." Doyle.App.81–83; R.Doc.1622, at ¶¶174–75. It considered not only "the size of the recovery," which is now over $1 billion, but also "the significant practice change relief." Doyle.App.85; R.Doc.1622, at ¶183. Relying on uncontested expert testimony, the District Court found that "for every shift of 0.1% in the average commission rate (e.g. from 2.66% to 2.56%) the total commission paid would be lowered by $2.1 billion" annually. *Id.*; SWC.App.818; R.Doc.1535-13 at ¶16. This relief is not just significant, it's historic.

Monestier seems to think the only appropriate yardstick of "success obtained" is the amount received by each individual class member. That's

not the law, and none of the authorities she cites support such a notion. In fact, in *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185 (S.D. Fla. 2006), the court declared a $1.075 billion settlement an "exceptional success" because it was "one of the largest settlements in class action history" and thus represented "the highest level of achievement." *Id*. at 1205. Class Counsel obtained a similar settlement amount here, representing the outer limit of Defendants' ability to pay. The court in *Pearson v. NBTY, Inc.*, 772 F.3d 778 (7th Cir. 2014), directed its criticism at the use of a "kicker" clause, in which any reduction in attorneys' fees would revert to the defendant rather than benefit the class. *Id*. at 786–87. The Settlements here contain no such clause and are completely non-reversionary. The settlement in *In re Dry Max Pampers Litig.*, 724 F.3d 713 (6th Cir. 2013), provided class members with no money and injunctive relief that the court found "nearly worthless." *Id*. at 715. That's far from the case here, where the Settlements provide both money and injunctive relief valued in the billions. And *In re High-Tech Emp. Antitrust Litig.*, No. 11-CV-02509, 2014 WL 3917126 (N.D. Cal. Aug. 8, 2014), is not a fee case at all – it simply found a proposed settlement amount inadequate in light of the case merits and prior

settlement amounts. *Id.* at *17. In short, none of Monestier's cited cases remotely casts doubt on the District Court's exercise of discretion in awarding fees.

Monestier finally cites this Court's *T-Mobile* decision. But this case involved far more work and risk than *T-Mobile*. In *T-Mobile* the case "had barely gotten off the ground before it settled." *T-Mobile*, 111 F.4th at 861. Counsel had worked "for just a matter of months," conducted "relatively little discovery," and engaged in no motions practice "save for responding to a motion for remand." *Id.* Yet despite this lack of work, counsel asked for a fee that resulted in a lodestar multiplier of 9.6 – "nearly twice as high" as the 5.3 multiplier previously approved by the Court. *Id.*

None of this applies here. Counsel bore incredible risk, litigating the case for over five years while investing 107,500 hours and $16.5 million in litigation expenses. Counsel reviewed millions of pages of documents; participated in 180 depositions; conducted expert discovery involving 20 experts producing 43 reports; and engaged in full motion practice that included summary judgment, class certification, and two appeals to this Court. And most importantly, Counsel went to trial and won. Had Plaintiffs lost, Counsel would have received nothing – not even

reimbursement for their expenses. But for all this work and risk, Counsel requested and received a lodestar multiplier of only 3.62 (which has since decreased). That's almost exactly the same as the 3.5 multiplier the Court endorsed in *T-Mobile* (and well below the 5.3 multiplier approved in *Rawa*). *T-Mobile*, 111 F.4th at 862; *Rawa*, 934 F.3d at 870.

## VI. THE DISTRICT COURT PROPERLY OVERRULED THE CHEATHAM AND SPRING WAY CENTER OBJECTIONS.

The Cheatham and Spring Way Center Objectors raise similar arguments. None show any abuse of discretion.

First, Objectors complain about the Settlements' nationwide scope. SWC Br. 10–11. But courts routinely approve nationwide settlements because defendants would have no incentive to settle "if they cannot buy something approaching global peace." *Berry v. Schulman*, 807 F.3d 600, 613 (4th Cir. 2015). Piecemeal settlement was impossible here because enforcement of the *Burnett* verdict would have "pushed NAR and its members into bankruptcy." Friedman.App.1329; R.Doc.1597, at 11; *see also* Doyle.App.62–63; R.Doc.1622, at ¶132 (acknowledging bankruptcy risk); Burnett.App.275; R.Doc.1596, at 7 (HomeServices acknowledging the same). Nor does it matter that the Settlement class is defined more broadly than the classes certified in *Burnett* and *Moehrl*. The Settlements

expressly resolve the nationwide claims asserted in *Gibson*, and courts regularly certify broader classes and release broader claims than those originally pleaded. *In re Gen. Am. Life Ins. Co. Sales Pracs. Litig.*, 357 F.3d 800, 805 (8th Cir. 2004). The nationwide Settlements provide the best relief possible for the class, far more than could be obtained by new law firms filing copycat cases around the country.

Second, Objectors argue that non-parties, including small brokerages and franchisees or affiliates of the Settling Parties, obtained releases for "nothing." Cheatham Br. at 20, 23. That's not correct: NAR is a membership organization and would not have paid $418 million if the release did not include its small agent and broker members. The same is true for HomeServices, which paid $250 million for a settlement that included a release of its franchisees. In any event, settlements commonly extend releases to non-parties, including corporate affiliates and franchisees. Friedman.App.945–46; R.Doc.1595, at 94–95 (collecting cases).

Third, Objectors complain that the settlement amounts are too low. SWC Br. 2. But they never told the District Court what amount they thought would have been adequate – they just speculated Defendants

could have paid more. Simply arguing that class members "did not get as much" as Objectors believed they should "falls far short of establishing the settlement agreement was unfair or inadequate." *Prof'l Firefighters Ass'n of Omaha, Loc. 385 v. Zalewski*, 678 F.3d 640, 649 (8th Cir. 2012). Plaintiffs' counsel carefully analyzed each Defendants' finances and determined that the settlement amounts were the most Defendants reasonably could pay.

Fourth, the District Court provided proper notice. A settlement notice need only "fairly apprise" class members of the settlement terms and the "options that are open to them in connection with the proceedings." *Grunin v. Int'l House of Pancakes*, 513 F.2d 114, 122 (8th Cir. 1975). The District Court's notice easily satisfies the *Grunin* standard. Nor was there any problem with the opt-in process for MLSs and brokerages. Cheatham Br. 15, 18–19. The NAR Settlement expressly states that opt-in agreements "may be modified or amended" in a "writing executed by Plaintiffs and Stipulating Party." March.App.442–43, 468; R.Doc.1458-1, at 89–90, 115. Where necessary, Plaintiffs and the Stipulating Parties properly agreed in writing to extend the opt-in deadlines. And as attested by Class Counsel, each opt-in agreement was

properly executed and its terms disclosed through the settlement website. Doyle.App.45; R.Doc.1622, at ¶90.

Fifth, the District Court gave Objectors a full opportunity to present their arguments. SWC Br. 31. Objectors could provide evidence and other materials to the Court. Indeed, some did. Doyle.App.219–20; R.Doc.1640, at 34:19–22, 35:13–21. And Objectors never asked to present live testimony. Even if they had, the District Court did not have to allow it. *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1187 (10th Cir. 2002). At any rate, the District Court placed no limit on Objectors' ability to submit written objections and arguments. Even now Objectors point to no evidence they were prevented from submitting.

## VII. THE DISTRICT COURT PROPERLY DENIED THE DOYLE MOTION TO INTERVENE.

Just four days before the final approval hearing, three nonparties ("Doyle Intervenors") moved to intervene. Doyle.App.154; R.Doc.1605. The Doyle Intervenors are not class members. Rather, they're individual real estate agents who say the Settlements may harm their professional interests. The District Court properly denied their motion as untimely. Doyle.App.1; R.Doc.1617.

## A. The Intervention Motion Was Untimely.

All intervention motions, whether mandatory or permissive, must be timely. *ACLU of Minnesota v. Tarek ibn Ziyad Acad.*, 643 F.3d 1088, 1093 (8th Cir. 2011). To assess timeliness, courts consider: (1) the extent the litigation has progressed; (2) the prospective intervenor's knowledge of the litigation; (3) the reason for the delay; and (4) prejudice from the delay. *United Food and Com. Workers Union, Loc. No. 663 v. U.S. Dep't of Agric.*, 36 F.4th 777, 780 (8th Cir. 2022). Each factor supports the District Court's conclusion that the eleventh-hour motion to intervene was untimely.

First, the litigation progressed for five years before the Doyle Intervenors filed their motion. The parties had conducted discovery, completed a weeks-long jury trial, and negotiated a comprehensive settlement that received preliminary approval. The objection deadline had long passed. This Court treats such "ninth-inning-with-two-outs intervention attempts" as almost per se untimely. *Uponor*, 716 F.3d at 1066.

Second, the Doyle Intervenors are NAR members and thus had knowledge for years of the case and related settlement negotiations.

Friedman.App.1326; R.Doc.1597, at 8 (noting NAR communication with members regarding settlement). Nor did the Doyle Intervenors claim they lacked knowledge. This factor weighs heavily against intervention. *United Food*, 36 F.4th at 781 ("[Because] [n]o Appellant avers that it lacked knowledge of the case ... the second factor weighs heavily against Appellants.").

Third, the Doyle Intervenors offered no explanation for their delay. They submitted no affidavits or records to verify any concrete inquiry they undertook. An "unpersuasive" reason for delay weighs against intervention, and no explanation at all provides even greater evidence of untimeliness. *Id.* at 781–82.

Fourth, allowing delayed intervention would significantly prejudice the parties. After preliminary approval, while the Doyle Intervenors waited, Plaintiffs provided class notice at considerable expense. And NAR began implementing the settlement reforms as of July 2024. Reopening the Settlement now would unravel those efforts and disrupt both sides' settled expectations. That's precisely the sort of prejudice that counsels against late-stage intervention. *Uponor*, 716 F.3d at 1065–66 (intervention four months after preliminary approval untimely).

**B.** **The Doyle Intervenors Failed to Satisfy the Rule 24 Requirements.**

The Doyle Intervenors sought mandatory intervention under Rule 24(a)(2). That rule, however, requires showing a "legally protectable" interest that the existing parties don't "adequately represent." *United States v. Metro. St. Louis Sewer Dist.*, 569 F.3d 829, 838–39 (8th Cir. 2009). The Doyle Intervenors claim the Settlement might cause their NAR membership dues to rise or otherwise harm their business by giving larger firms a competitive edge. Doyle Br. 20–21. Such "general economic interests," however, "are not protectable and cannot serve as the basis for intervention." *Id.*; *accord Curry v. Regents of Univ. of Minnesota*, 167 F.3d 420, 422–23 (8th Cir. 1999) (possible decrease in university funding insufficient to show legally protectable interest).

The Doyle Intervenors' claimed interests are also too speculative to permit intervention. *Med. Liab. Mut. Ins. Co. v. Alan Curtis LLC*, 485 F.3d 1006, 1008–09 (8th Cir. 2007) (intervention cannot be based on interest that is "contingent upon the occurrence of a sequence of events before it becomes colorable"). The Doyle Intervenors offered no evidence to show either that their NAR membership fees have increased or they have suffered competitive harm. They no doubt have strong views about

the Settlement, but the place to air those views is at NAR meetings, not federal court.

The Doyle Intervenors also sought permissive intervention under Rule 24(b). But the District Court's decision to deny that motion is "wholly discretionary" and reversal "border[s] on nonexistent." *South Dakota ex rel. Barnett v. U.S. Dept. of Interior*, 317 F.3d 783, 787–88 (8th Cir. 2003). The District Court properly explained that intervention was inappropriate given the advanced stage of litigation and NAR's ability to protect the Objectors' interests, and this is "not one of the unique or rare cases where [the Court] can conclude that the district court clearly abused its discretion." *Id.*

## VIII. APPELLANTS WHO FAILED TO APPEAR AT THE FINAL APPROVAL HEARING WAIVED THEIR OBJECTIONS.

The District Court ordered "all objectors and their attorneys to appear in person" at the final approval hearing, warning that if any objector failed to appear, their objection would be waived. March.App.1332; R.Doc.1566. Wang and Spring Way Center complied, but the other Objectors refused to attend. As a result, the District Court held they waived their objections. Doyle.App.18–19; R.Doc.1622, at ¶36. The District Court nonetheless allowed counsel for non-appearing

Objectors to present oral arguments, and its approval order addressed every Objection on the merits.

The defaulting Objectors now ask this Court to excuse their refusal to attend on due process grounds. Due process, however, is "satisfied where class members received notice of the settlement proposal and were able to argue their objections to the district court." *In re Wireless Tel. Fed. Cost Recovery Fees Litig.*, 396 F.3d 922, 931 (8th Cir. 2005). Due process does ***not*** mean that objectors are "entitled to dictate the means by which the court considers the fairness of the proposed settlement." *Hershey v. ExxonMobil Oil Corp.*, No. 07-1300, 2012 WL 5306260, at *2 (D. Kan. Oct. 26, 2012). Once parties "insert [themselves] into the dispute" by filing an objection, they must "play by the rules that the district court set[s]." *T-Mobile*, 111 F.4th at 858.

There's no dispute that every defaulting Objector received notice of the proposed Settlements. Likewise, each defaulter could (and did) present their objections to the District Court. But they refused to "play by the rules" that required them to appear at the fairness hearing. The in-person attendance requirement was not onerous – as the District Court noted, courts impose similar requirements all the time.

Doyle.App.17; R.Doc.1622, at ¶34 (collecting cases). Beyond the cases cited by the District Court, other examples include *Hershey*, 2012 WL 5306260, at *4 ("courts have specifically approved the requirement that an objector seeking to thwart a proposed class-wide settlement ... personally attend the fairness hearing") *aff'd*, 550 Fed. Appx. 566; *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 527 n.13 (E.D. Mich. 2003) (requiring objectors to attend final approval hearing); and *James v. JPMorgan Chase Bank, N.A.*, No. 8:15-cv-2424, 2016 WL 6908118, at *3 (M.D. Fla. Nov. 22, 2016) (same).

In addition, district courts often impose significantly ***more*** burdensome requirements than the attendance requirement here, such as requiring objectors to sit for depositions. *In re Equifax Inc. Customer Data Security Breach Litigation*, 999 F.3d 1247, 1266-67 (11th Cir. 2021). As with in-person attendance at a hearing, depositions "are a normal part of litigation" that require objectors and attorneys to travel and take time away from other obligations. *Id.* Preparing and sitting for a deposition is more taxing than simply attending a hearing. Yet this Court and others recognize that due process allows deposition requirements. *T-Mobile*, 111 F.4th at 858 ("Pentz objects that by subjecting her to a deposition, the

district court 'unduly encumbered' her due-process right to be heard. We doubt it.").

Enhanced objection requirements, including in-person attendance, are particularly important to ferret out "objections that are lawyer-driven" or "filed with ulterior motives." *Equifax*, 999 F.3d at 1266. That was the case here, where most of the objections were filed by plaintiffs recruited by lawyers to participate in copycat lawsuits. Other objections were filed by disgruntled real estate professionals. And as noted by the District Court, at least one Objector used the approval process to hurl threats and accusations of misconduct. This Objector's conduct was so alarming that the U.S. Marshals Service and the U.S. Attorney's Office had to become involved. Given this background, the District Court was well-justified in requiring all Objectors to appear in person to assist the Court in assessing whether their objections were brought in good faith. Although the defaulting Objectors considered this oppressive, appearing for a single afternoon hearing is a small burden given the stakes involved: industry-wide practice reforms and hundreds of millions of dollars in recovery.

The defaulters particularly complain that the District Court's original Notice and Preliminary Approval Order contained no in-person attendance requirement. But courts always retain inherent power to modify their orders to meet changed circumstances. *Dietz v. Bouldin*, 579 U.S. 40, 41 (2016). The District Court's concerns here arose after it granted preliminary approval and class notice was published, so it notified every objector of the updated attendance requirement through ECF. And that effort was successful: no defaulter claims they were unaware of the in-person attendance requirement.

In the end the waiver issue matters little because the District Court fully considered and rejected each objection on the merits. This Court may likewise prefer to rule on substantive grounds. But if it does, the Court might want to stress that district courts possess broad discretion to impose reasonable controls over the class settlement approval process, which includes common-sense requirements designed to ensure objections are made in good faith by class members, not lawyers.

## IX. THE DISTRICT COURT COMMITTED NO ERROR IN REQUESTING A PROPOSED ORDER.

At the District Court's request, Plaintiffs provided a proposed order for their motion to approve the Settlements. The District Court adopted

many portions of this proposal but changed others. Two objectors suggest that the District Court's consideration of the proposed order changes the standard of review or otherwise constitutes error. Mullis Br. 21; Monestier Br. 29. It does not.

The submission of proposed orders is common. Indeed, the Western District of Missouri governs the practice by local rule. W.D. Mo. Local Rule 7.0(f). The practice is unobjectionable because the court remains in control at all times and makes the final decisions. For this reason, "even when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous." *Anderson v. City of Bessemer City*, 470 U.S. 564, 572 (1985); *accord Petrovic v. Amoco Oil Co.*, 200 F.3d 1140, 1150 (8th Cir. 1999) (same).

Plaintiffs didn't craft their proposed order on a blank slate. Rather, their proposal carefully tracked and mirrored the District Court's many prior rulings in the case, including during class certification, summary judgment, and a trial on the merits. The proposed order also reflected the District Court's views expressed when it granted preliminary approval of the Settlements. *Cf. Petrovic*, 200 F.3d at 1150 (where "the facts of a case are complex, practical considerations justify the judge's decision not to

rewrite those findings which are accepted as proper.") (internal quotation omitted). And the District Court didn't blindly accept Plaintiffs' proposed order but made changes as needed to reflect its rulings – "an act that reflects more than just a cursory analysis and interpretation." *Id*. Nothing in the record suggests that the District Court abdicated its responsibility to exercise independent judgment.

## CONCLUSION

The District Court found that none of the objections benefited the class members. The best option for the Class was to secure one of the largest collective antitrust settlements ever, reform the real estate industry to save home sellers billions, and avoid the risks of litigation and bankruptcy. The Settlements were not just allowed – they were the only logical choice for the Class.

Dated: September 15, 2025    Respectfully submitted:

**KETCHMARK & McCREIGHT, P.C.**
By: */s/ Scott A. McCreight*
Michael S. Ketchmark    #41018
Scott A. McCreight      #44002
11161 Overbrook Road, Suite 210
Leawood, Kansas 66211
Tele: (913) 266-4500
mike@ketchmclaw.com
smccreight@ketchmclaw.com

**BOULWARE LAW LLC**
Brandon J.B. Boulware    #54150
Jeremy M. Suhr          #60075
1600 Genessee Street, Suite 956A
Kansas City, MO 64102
Tele: (816) 492-2826
brandon@boulware-law.com
jeremy@boulware-law.com

**WILLIAMS DIRKS DAMERON LLC**
Michael A. Williams    #47538
Eric L. Dirks          #54921
1100 Main Street, Suite 2600
Kansas City, MO 64105
Tele: (816) 945-7110
mwilliams@williamsdirs.com
dirks@williamsdirks.com

**COHEN MILSTEIN SELLERS & TOLL PLLC**
Benjamin D. Brown
Robert A. Braun
Sabrina Merold
1100 New York Ave. NW, Fifth Floor
Washington DC 20005

Tele: (202) 408-4600
bbrown@cohenmilstein.com
rbraun@cohenmilstein.com
smerold@cohenmilstein.com

Daniel Silverman
769 Centre Street, Suite 207
Boston, MA 02130
Tele: (617) 858-1990
dsilverman@cohenmilstein.com

**HAGENS BERMAN SOBOL
SHAPIRO LLP**
Steve W. Berman
1301 Second Avenue, Suite 2000
Seattle, WA 98101
Tele: (206) 623-7292
steve@hbsslaw.com

Rio S. Pierce
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Tele: (510) 725-3000
riop@hbsslaw.com

Nathan Emmons
Jeannie Evans
455 North Cityfront Plaza Drive,
Suite 2410
Chicago, IL 60611
Tele: (708) 628-4949
nathane@hbsslaw.com
jeannie@hbsslaw.com

**SUSMAN GODFREY, L.L.P.**
Marc M. Seltzer
Steven G. Sklaver
1900 Avenue of the Stars, Suite 1400
Los Angeles, California 90067

Tele: (310) 789-3100
mseltzer@susmangodfrey.com
ssklaver@susmangodfrey.com

Beatrice C. Franklin
One Manhattan West
New York, New York 10001
Tele: (212) 336-8330
bfranklin@susmangodfrey.com

## CERTIFICATE OF COMPLIANCE

The undersigned certifies that this brief complies with the type-volume limitation in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. This brief has been prepared using Microsoft Word for Microsoft 365, and according to that program the brief contains 12,996 words, excluding the items that may be exempted from computing any length limit as set forth in Rule 32(f). The brief was prepared using a fourteen (14) point Century Schoolbook font.

Dated: September 15, 2025
*/s/ Scott A. McCreight*
Scott A. McCreight
Counsel for Plaintiffs-Appellees

## CIRCUIT RULE 28A(h) CERTIFICATION

The undersigned hereby certifies that I have filed electronically, pursuant to Circuit Rule 28A(h), a version of the brief in PDF format. I hereby certify that the file has been scanned for viruses and that it is virus free.


Dated: September 15, 2025          */s/Scott A. McCreight*
                                   Scott A. McCreight
                                   Counsel for Plaintiffs-Appellees

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on September 15, 2025, an electronic copy of the Brief of Plaintiffs-Appellees was filed with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system, and as all participants in this case are registered CM/ECF users, service of the Brief will be accomplished by the CM/ECF system.

Dated: September 15, 2025    */s/ Scott A. McCreight*
                Scott A. McCreight
                Counsel for Plaintiffs-Appellees