# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

Rhonda Burnett, et al.,

Plaintiff-Appellees,

v.

National Association of Realtors, et al.,

Defendants-Appellees,

v.

Brown Harris Stevens, et al.,

Intervenors-Appellees

v.

Tanya Monestier,

Interested party-Appellant

Appeal from the United States District Court
for the District of Missouri,
Case No. 19-cv-00332 (SRB), Hon. Stephen R. Bough

# REPLY BRIEF OF TANYA MONESTIER

Tanya Monestier
101 Charleston Ave
Kenmore, NY, 14217
(401) 644-2383
tanyam@buffalo.edu
*Objector-Appellant*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES……………………………………………...(iii)

INTRODUCTION ......................................................................1

ARGUMENT ............................................................................2

   I.   PLAINTIFFS HAVE FAILED TO ESTABLISH ARTICLE III
      STANDING ..............................................................2

   II.  THE DISTRICT COURT ERRED BY VALUING INJUNCTIVE
      RELIEF BASED ON BENEFITS TO NON-CLASS
      MEMBERS……………………………………………………………...11

   III. PLAINTIFFS AND NAR IGNORE MONESTIER'S CORE
      CHALLENGES TO THE PRACTICE CHANGES……………........14

      A.  The Settlement Did Not "Eliminate" NAR's Anti-
         Competitive Rule……………………………………………15

      B.  The Practice Changes Do Not Benefit Past Home
         Sellers………………………………………………………17

   IV. PLAINTIFFS DO NOT ADEQUATELY RESPOND TO
      ENFORCEMENT CONCERNS……....................................19

   V.  PLAINTIFFS AND NAR DO NOT ENGAGE SERIOUSLY WITH
      CONSTITUTIONAL DUE PROCESS CONCERNS……………....21

      A.  Plaintiffs Believe It Is Acceptable to Secretly Ghostwrite
         the Order Approving Their Own Settlement and Fees….......22

      B.  Appellees Turn a Blind Eye to the Due Process Problems
         With the Court's In-Person Order………………………........27

   VI. PLAINTIFFS FAIL TO ADDRESS THE ARGUMENT THAT A
      RECOVERY OF 0.1% OF ACTUAL DAMAGES DOES NOT

WARRANT A THIRD-OF-A-BILLION-DOLLAR FEE AWARD......................................................................29

CONCLUSION ........................................................................30

CERTIFICATE OF COMPLIANCE ...................................................34

CERTIFICATE OF SERVICE..............................................................35

# TABLE OF AUTHORITIES

**Cases**                                                              **Page**

*Allapattah Services, Inc. v. Exxon Corp.*,
   454 F. Supp. 2d 1185 (S.D. Fla. 2006) ...................................30

*Arizona Christian Sch. Tuition Org. v. Winn*,
   563 U.S. 125 (2011) ........................................................9

*Askew v. United States*,
   680 F.2d 1206 (8th Cir. 1982) .........................................26

*Bender v. Williamsport Area Sch. Dist.*,
   475 U.S. 534 (1986) ...............................................2, 3, 6

*Bradley v. Md. Cas. Co.*,
   382 F.2d 415 (8th Cir. 1967) ..........................................26

*Frank v. Gaos*,
   586 U.S. 485 (2019) .....................................................9, 10

*In re Doe*,
   640 F.3d 869 (8th Cir. 2011) .....................................25, 26

*In re Equifax Inc. Customer Data Sec. Breach Litig.*,
   999 F.3d 1247 (11th Cir. 2021) .......................................22

*In re Google Referrer Header Priv. Litig.*,
   465 F. Supp. 3d 999 (N.D. Cal. 2020) ............................10

*In re T-Mobile Customer Data Sec. Breach Litig.*,
   111 F.4th 849 (8th Cir. 2024) ........................................31

*King Iron Bridge & Mfg. Co. v. Cnty. of Otoe*,
  120 U.S. 225, 7 S. Ct. 552, 30 L. Ed. 623 (1887) ...................................2

*Kokkonen v. Guardian Life Ins. Co. of Am.*,
  511 U.S. 375 (1994) ...................................................................8

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) ..............................................................2, 11

*Oetting v. Norton*,
  795 F.3d 886 (8th Cir. 2015) .....................................................4

*Robertson v. Allied Sols., LLC*,
  902 F.3d 690 (7th Cir. 2018) .....................................................9

*Schumacher v. SC Data Ctr., Inc.*,
  912 F.3d 1104 (8th Cir. 2019) ...................................................9

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ...............................................................6

*Thompson v. Runnels*,
  705 F.3d 1089 (9th Cir. 2013) ..................................................12

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ............................................................5, 11

## Rules

Fed. R. Civ. P. 83(a)(1) ............................................................22

Federal Rule of Appellate Procedure 27(a)(1) ...........................6

## Other Authorities

4 Newberg and Rubenstein on Class Actions §14:18 (6th ed.) ...............12

*Et Tu, Agent? Commission-Based Steering in Residential Real Estate*,
   110 Iowa L. Rev. 1473 (2025) ...............................................................17

# INTRODUCTION

Plaintiffs and NAR fail to meaningfully engage with Monestier's arguments, the requirements of Rule 23 and constitutional due process, or controlling precedent. Instead, they urge this Court to approve the settlement as fair, adequate and reasonable for 40 million home sellers largely on the strength of their own assurances—describing the settlement as "historic," "pathbreaking," "an enormous victory for class members," and "exceptionally favorable." *See* Plaintiffs' Br., at 1, 21, 51; NAR Br., at 1, 14, 15, 17, 24. But this so-called "historic" resolution will put a mere $16 in the pocket of the average class member, who paid over $10,000 in inflated commissions. The touted practice changes, meanwhile, are not only insignificant but also easily evaded and functionally unenforceable.

Given the subject matter of the instant litigation, a real estate analogy is apt. Plaintiffs and NAR direct this Court to airbrushed listing photos of a home on Zillow. Monestier, by contrast, draws attention to the home's structural defects, faulty wiring, and unpermitted additions. Plaintiffs ignore those major flaws and urge this Court to focus, once

again, on the airbrushed images. That tactic may have succeeded below. It should not prevail here.

## ARGUMENT

## I. PLAINTIFFS HAVE FAILED TO ESTABLISH ARTICLE III STANDING

Article III standing is required for the district court to approve a settlement that had "historic" and "pathbreaking" injunctive relief at its epicenter. Plaintiffs' Br., at 1, 21, 51. Plaintiffs bear the burden—both here and below—of establishing standing. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). "[T]he presumption . . . is that the court below was without jurisdiction" unless "the contrary appears affirmatively from the record." *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 546 (1986), *quoting King Iron Bridge & Mfg. Co. v. Cnty. of Otoe,* 120 U.S. 225, 7 S. Ct. 552, 30 L. Ed. 623 (1887).

The record does not contain a shred of evidence to support Article III standing. Lacking proof, Plaintiffs are left to rely on nothing more than class counsels' bald speculation. Class counsel claims that because the named plaintiffs also happen to be current homeowners, they cannot sell their homes again without facing the challenged practices and therefore "will suffer harm when they sell their homes." Plaintiffs' Br., at

39, 45. Class counsels' say-so is not evidence. Plaintiffs cite no evidence in the record that named plaintiffs "cannot" sell their homes again without facing the challenged practices. *Bender*, 475 U.S. at 547 (finding no Article III standing where "[t]here is nothing in the record indicating anything about [plaintiff's] status as a parent" and nothing "in the record to indicate" injury). Monestier recently bought a home in a private sale. No realtor was involved, and the property was not listed on the MLS.[1] It is quite possible to sell a home without the involvement of NAR participants.

Even setting that aside, Plaintiffs have not established that the named plaintiffs will sell their homes again at all, much less do so in the "imminent" future. The only fact conveyed about any named plaintiff is that Hollee Ellis sold a home in 2020. Plaintiffs' Br., at 40, n. 7. What Plaintiffs fail to mention is that Ellis sold her home two years *before* she joined the instant lawsuit. R. Doc. 1595, at 3 ("Hollee Ellis . . . joined as [a] class representative[ ] in the *Burnett* action with the Third Amended

---

[1] Plaintiffs claim that "owners trying to sell their home without using an MLS suffer from 'steering' and therefore sellers have no realistic choice but to list on an MLS." Plaintiffs' Br., at 42. Plaintiffs' citations to their own filing do not support these statements, and several of the quotations do not appear on the referenced pages.

Complaint [in 2022]"). A track record where no named plaintiff in the original action sold their home belies any suggestion that home sales by named plaintiffs were imminent.[2]

The law requires more than speculative assumptions by counsel about what *might* happen someday. *See* Plaintiffs' Br., at 40 ("[*W*]*hen* Plaintiffs sell again they *would have* no real alternative but to . . . pay the inflated commissions[.]"); at 45 (class members "*will* suffer harm *when* they sell their homes."); *Id.* ("class members are . . . homeowners who *may* sell homes in the future") (emphasis added). Plaintiffs must show a concrete, imminent injury-in-fact. They have not. Their theory of future harm rests on conjecture piled atop conjecture, precisely what Article III forbids.

And if that weren't enough, Plaintiffs face yet another problem. They concede that it will take time for these practice changes to

---

[2] Standing must exist as of the date the Complaint is filed. Accordingly, Plaintiffs must show that one of the original named plaintiffs—Sitzer, Winger, Burnett, or Hendrickson—had standing at the outset, and that standing was maintained thereafter. *Oetting v. Norton*, 795 F.3d 886, 891 (8th Cir. 2015) (". . . Article III demands a named plaintiff who has standing at the time a class action complaint is filed[.]").

potentially take effect. Plaintiffs' Br., at 46. If this is true, how can named plaintiffs be facing "imminent" harm that is redressable by the proposed injunctive relief?

Redressability is an independent problem. Article III requires proof that the named plaintiffs' alleged injury is "likely [to] be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). The settlement's injunctive relief does not meet that standard. Whatever risk these named plaintiffs once faced has already been mitigated by their participation in this litigation: they now know that they are under no legal obligation to offer or pay a buyer-broker commission.[3]

Moreover, whether named plaintiffs ever pay inflated commissions in the future depends not on the presence or absence of certain NAR rules, but on independent choices of brokerages and on industry market forces. Post-settlement, brokerages can still insist on a seller paying six percent commission as a condition of listing. Nothing about the injunctive

---

[3] Plaintiffs misrepresent Monestier's argument as being that any class member who *lists their home* on an MLS suffers only self-inflicted harm. Plaintiffs' Br., at 42. Monestier's argument was that class members who pay *inflated commissions knowing they don't have to* suffer self-inflicted harm.

relief at issue redresses the problem of inflated commissions for named plaintiffs.

Plaintiffs acknowledge they don't have evidence to support Article III standing. They request, in a footnote, that this Court permit them to introduce "supplemental evidence" of standing.[4] But this case "involved more than 5 million documents, 180 depositions, and 20 experts who produced 43 reports." Plaintiffs' Br., at 2. If there were evidence of standing, surely Plaintiffs could point to it somewhere in this gargantuan pile of paper.

Even though Plaintiffs conceded in filings that Article III standing was required, they stealthily changed course after this Court rejected their attempt to manufacture standing based on evidence from a different case. *See* Plaintiffs' Br., at 40–41. As best can be gleaned, it seems that Plaintiffs are now advancing the remarkable proposition that *even*

---

[4] The request is improper; a request for relief must be made by way of motion. Federal Rule of Appellate Procedure 27(a)(1). But, in any event, the Supreme Court has clearly said that supplementation of the record is not permitted "after the trial is over, judgment has been entered, and a notice of appeal has been filed." *Summers v. Earth Island Inst.*, 555 U.S. 488, 500 (2009). *See also Bender*, 475 U.S. at 549 ("the parties cannot . . . invoke the Article III jurisdiction of this Court through a belated nontestimonial statement" not in the record).

*though* they asked for an injunction in their Complaint,[5] *even though* they and the Court repeatedly referred to the practice changes as "injunctive relief"[6] and spoke of the Court's "federal injunctive authority,"[7] *even though* the Court pronounced that it had the power to "directly" enforce the injunctive relief,[8] *even though* NAR publicly affirmed that the injunctive relief was a court order with "the pain of contempt" and "the penalty of contempt,"[9] and *even though* the injunctive relief formed the primary benefit for the class,[10] constitutional limits on standing simply do not apply. Plaintiffs believe they are free, apparently, to craft what they claim is injunctive relief that transforms an entire industry, all

---

[5] The Complaint's "Prayer for Relief" contains three references to "injunction" or "injunctive relief," R. Doc. 759, at 53, with five additional references elsewhere in the Complaint.

[6] In its order, the Court referenced the settlement's "injunctive relief" seven times. Add. 29–30, 52, 61, 64, 66; App. 307–308, 330, 339, 342, 344; R. Doc. 1622, at 29–30, 52, 61, 64, 66. Plaintiffs referenced the settlement's "injunctive relief" twenty-eight times in their two motions for settlement approval. *See* R. Doc. 1535, at 11, 15, 20, 25, 43, 44, 47, 48, 61, 62, 63; R. Doc. 1595, at 57–58, 87–88, 98, 101, 102.

[7] Plaintiffs' Br., at 43.

[8] Add. 22; App. 300; R. Doc. 1622, at 22.

[9] *Burnett* Transcript, at 16, 24. The Court did not take issue with NAR's characterization. Plaintiffs also repeatedly state that the Court has direct enforcement authority. *See* R. Doc. 1595, at 32, 25.

[10] Monestier Br., at 28–29. *See also* R. Doc. 1458–1, at 31 (settlement agreement states "the practice changes set forth here are a material component of this Settlement Agreement[.]").

while bypassing constitutional standing limits. They believe that 40 million unnamed class members can be made to release claims for injunctive relief[11] even though named plaintiffs never had standing to seek that relief in the first place. This position has no support in law or fact. If accepted, it would permit private litigants to structure settlements that evade Article III requirements simply by directing a court not to formally issue an injunction, all while functionally creating one.[12]

Plaintiffs seem to be saying that there is no Article III standing requirement because this is just a private settlement without a "judicial imprimatur" over the terms of the settlement. *Id.*, at 40. Nothing could be further from the truth. The district court retained "continuing and exclusive jurisdiction" over enforcement of the settlement. Add. 87; App. 365; R. Doc. 1622, at 87. In *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375 (1994), the Supreme Court held that "retain[ing]" jurisdiction over a settlement agreement makes that agreement "part of

---

[11]  App. 22; R. Doc. 1458–1, at 18.

[12] The parties stipulated that the "the requirements of . . . [Rule] 23(b)(2) . . . are satisfied, and, subject to Court approval, the Settlement Class shall be certified for Settlement purposes . . ." R. Doc. 1458–1, at 13.

the order of dismissal," and subject to direct enforcement by the Court. *Id.*, at 381. *See also Arizona Christian Sch. Tuition Org. v. Winn*, 563 U.S. 125, 146 (2011) ("In an era of frequent litigation, class actions, sweeping injunctions with prospective effect, and *continuing jurisdiction to enforce judicial remedies*, courts must be more careful to insist on the formal rules of standing, not less so.") (emphasis added).

In *Schumacher v. SC Data Center, Inc.*, 912 F.3d 1104, 1105 (8th Cir. 2019), this Court held that Article III standing is required in the class action settlement context because "[a]n approved [class action] settlement takes the form of a judgment of the court, and without both Article III power and proper subject-matter jurisdiction, the court cannot act." *Id.*, *quoting Robertson v. Allied Solutions, LLC*, 902 F.3d 690, 698 (7th Cir. 2018). This Court vacated class action settlement approval in *Schumacher* because there was "no finding in the record" below regarding Article III standing. *Id.*, at 1106.

Plaintiffs cite *Frank v. Gaos*, 586 U.S. 485, 492 (2019) for the proposition that "Because the District Court undisputedly had 'jurisdiction over the dispute,' it had authority to 'approve [the] proposed class settlement' without raising Article III concerns." Plaintiffs' Br., at

41. Plaintiffs grossly misrepresent *Frank,* which literally says the opposite: "A court is powerless to approve a proposed class settlement if it lacks jurisdiction over the dispute, and federal courts lack jurisdiction if no named plaintiff has standing." 586 U.S. at 492. If Plaintiffs had properly read *Frank*, instead of cherry-picking two or three random words from the opinion, they would realize the case fatally undercuts their contention that standing is not required to approve a class action settlement.

Both this case and *Frank* involved an initial claim for damages and injunctive relief, followed by a district court approving an eventual settlement without considering Article III standing. The Supreme Court in *Frank* concluded that because no court had analyzed whether any named plaintiff had Article III standing, the case should be remanded. *Id.*, at 493. On remand, the district court went through each of the complaint's six claims for relief, including the claim for injunctive relief, to determine whether standing existed. *In re Google Referrer Header Priv. Litig.*, 465 F. Supp. 3d 999, 1006 (N.D. Cal. 2020).

Here, this would not be possible since the case has proceeded through "a full-blown trial on the merits." Plaintiffs' Br., at 43. Thus,

Plaintiffs are limited by the facts presented at trial. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021) ("[I]n a case like this that proceeds to trial, the specific facts set forth by the plaintiff to support standing 'must be supported adequately by the evidence adduced at trial'.") (*quoting Lujan*, 504 U.S. at 561). Since no such evidence exists—or the Plaintiffs would have undoubtedly pointed to it—this Court must vacate the settlement.

## II. THE DISTRICT COURT ERRED BY VALUING INJUNCTIVE RELIEF BASED ON BENEFITS TO NON-CLASS MEMBERS

Plaintiffs and NAR claim it was appropriate for the Court to assess the value of the injunctive relief to U.S. "consumers" at large, rather than to the class members specifically. They are wrong. Rule 23 requires courts to assess whether injunctive relief is fair, adequate and reasonable *for class members*—not for society writ large, and not for non-class members who may choose to engage a realtor in the next six years.

Appellees do not address any of the myriad appellate cases Monestier cited for this proposition. *See* Monestier Br., at 42–43. Nor do Plaintiffs address the undisputed fact that their expert witness premised his entire valuation of the injunctive relief on a supposed benefit to future

"U.S. home sellers and buyers"—not to class members. Monestier Br., at 41.

Instead, Plaintiffs attempt to dodge the glaring legal error in two ways. First, they claim that Monestier waived this argument because "she never argued below that the Settlements benefit only 'consumers' rather than class members." Plaintiffs' Br., at 44. Of course Monestier did not argue that the settlement benefits "only 'consumers' rather than class members." *Id.* That is because Monestier argued that the practice changes benefit *no one.* *See* App. 152–53; R. Doc. 1552*,* at 93, 94. Monestier could not have predicted that the district court would use an incorrect legal standard to value the injunctive relief: the benefit it provided to *future* "consumers," rather than the value it provided to class members. An objector is not expected to anticipate all the ways that a court might legally err and prophylactically address them in an objection. *Thompson v. Runnels*, 705 F.3d 1089, 1098 (9th Cir. 2013) ("an objector need not be an oracle and predict issues that will arise for the first time in the district court's final order."); 4 NEWBERG AND RUBENSTEIN ON CLASS ACTIONS §14:18 (6th ed.) ("In the class action context, the key exception to the requirement that only issues raised below may be appealed is that

issues that surface for the first time in the court's final approval order may be appealed . . . [I]f the trial court applied the wrong legal standard in granting final approval or made some other error that had not existed prior to the objection deadline, the waiver doctrine does not apply.").

Second, Plaintiffs claim that because class members are homeowners "who may sell homes in the future," they stand to "greatly benefit" from the practice changes. Plaintiffs' Br., at 45. Plaintiffs' own words ("*may* sell homes in the future") bely any argument that class members will benefit from the practice changes.

To value the injunctive relief for class members, the Court would have had to consider *when* any supposed benefit would materialize, *how much* commissions would fall, and *how many* of the forty million class members would sell through a realtor during the window between when commissions go down and when the injunctive relief ends. Since Plaintiffs concede that "home sales occur, on average, once every twelve years," that latter number is likely to be very low. Plaintiffs' Br., at 40.

But even there, the numbers would still be speculative because they hinge on an untested assumption—i.e., *that* commissions will go down. To date, the opposite is true: commissions are going up. Monestier Br., at

45–46. The studies and newspaper articles are everywhere: "Why a Landmark Settlement on Realtor Fees Hasn't Cut Costs"[13]; "After a year of NAR's new rules, commissions are . . . up?"[14]; "Agent Commissions Edge Higher in 2025, One Year After Landmark NAR Settlement"[15]; "Why broker fees have barely changed since the big settlement."[16]

What Plaintiffs really seek credit for is having "change[d] th[e] system," irrespective of whether that change benefits anyone in the class. Plaintiffs' Br., at 42. But Rule 23 does not reward class counsel for industry-wide regulatory experiments. It protects the interests of class members—here, past home sellers—whose legal claims are being bargained away. Plaintiffs have not demonstrated, and the district court did not find, that the injunctive relief provides any value to those individuals.

## III. PLAINTIFFS AND NAR IGNORE MONESTIER'S CORE CHALLENGES TO THE PRACTICE CHANGES

---

[13] https://www.wsj.com/real-estate/why-a-landmark-settlement-on-realtor-fees-hasnt-cut-costs-0dd35edc.

[14] https://www.realestatenews.com/2025/08/16/after-a-year-of-nars-new-rules-commissions-are-up.

[15] https://www.prnewswire.com/news-releases/agent-commissions-edge-higher-in-2025-one-year-after-landmark-nar-settlement302483289.html.

[16] https://www.axios.com/2025/05/17/realtor-commission-broker-fee.

Monestier made the argument that the practice changes are meaningless because they do nothing to change the core underlying dynamics of commission arrangements and allow for easy, and NAR-sanctioned, workarounds.

Tellingly, Appellees avoid describing the substance of the practice changes, opting instead for vague references to "transparency" and "significant[ ] reform" in the residential real estate industry. *See* Plaintiffs' Br., at 12; NAR Br., at 32. Indeed, based on their submissions, one would be hard-pressed to discern what specific changes NAR agreed to, let alone why those changes are purportedly so transformative.

Appellees steer clear of specifics because a closer examination reveals that the supposed reforms do not meaningfully alter the status quo and cannot support a finding that the settlement is fair, adequate and reasonable under Rule 23. In short, Appellees focus this Court's attention on the pretty Zillow photos because that is the only way they can hide the fact that the foundation is crumbling.

A. <u>The Settlement Did Not "Eliminate" NAR's Anti-Competitive Practices</u>

Plaintiffs' underlying legal argument was that sellers were forced to pay inflated commissions because of NAR's "Cooperative

Compensation" Rule—a rule that required a seller to make an offer of compensation to a buyer-broker. This rule facilitated steering and resulted in the maintenance of a seller-paid 5–6% commission structure across the industry.

Plaintiffs and NAR misleadingly suggest that the practice changes have eliminated the anti-competitive practices at issue. *See*, *e.g.*, Plaintiffs' Br., at 5 ("NAR agreed to *eliminate* all requirements that listing brokers or sellers make offers of compensation to buyer brokers, and that compensation 'offers, if made, must be blanket, unconditional, or unilateral.'"); 38 (the settlement "*eliminate[s]* Defendants' challenged practices"); 44 (referring to the settlement as "*eliminating* Defendants' challenged practices") (emphasis added).

"Eliminating" anti-competitive rules sounds impressive until one realizes that the challenged rule was not really mandatory in the first place. Pre-settlement, a seller had to offer *something* to a buyer-broker, but it could be as little as one penny. Now, post-settlement, the seller can offer zero pennies. Monestier Br., at 27.[17] Thus, when Plaintiffs speak of

---

[17] The settlement expressly preserves advance offers of compensation, which necessarily allows steering to continue and causes sellers to pay supra-competitive rates. This was the *exact* argument Plaintiffs

"eliminating" NAR's anti-competitive conduct, they are simply referring to the 1-cent-down-to-0-cents change.[18]

B. <u>The Practice Changes Do Not Benefit Past Home Sellers</u>

Monestier's brief comprehensively dismantled the notion that the settlement's core changes benefit past home sellers. She engaged with the substance of the two main practice changes to show why the settlement offers no value for class members. Appellees stay silent in response.[19]

First, NAR agreed to take offers of compensation to a buyer-broker off the MLS and to not create an MLS-surrogate. This change is purely cosmetic: it takes information from one website and moves it to another. Instead of checking "realtor.com" for how much compensation a seller is

---

advanced in their Complaint and that now they criticize Monestier for making. *See* R. Doc. 759, at 4, 9.

[18] One law review article concluded that "our data suggests that [eliminating the mandatory rule is] unlikely to be effective." This is because "the minimum commission requirement is not driving sellers' current behavior[.]" Jordan Barry, Will Fried & John Hatfield, *Et Tu, Agent? Commission-Based Steering in Residential Real Estate*, 110 IOWA L. REV. 1473, 1563–64 (2025).

[19] Appellees think that the number of words in a ghostwritten district court opinion signals a "reasoned response." Plaintiffs' Br., at 44. A reasoned response is not measured by word count, but instead by substantive engagement by the court with the actual arguments presented.

offering to a buyer-broker, one would have to check "remax.com" or "coldwellbanker.com."

Second, the settlement requires a buyer-broker to sign a written agreement with a buyer prior to touring any properties. Monestier argued in her appeal that the district court failed to consider that this requirement is easily bypassed, through modifications or touring agreements, rendering the written buyer agreement requirement superfluous. Monestier's legal argument, developed over multiple pages and supported by concrete evidence was that "[w]hen an injunction *allows* conduct that is economically indistinct from the status quo, the court cannot ascribe positive value to it in the Rule 23 analysis." Monestier Br., at 49.

Appellees conspicuously avoid responding to this argument. Instead, they mischaracterize the argument as a concern about rogue actors exploiting "workarounds." NAR Br., at 34; Plaintiffs' Br., at 46. It is not. The argument is that the settlement—according to NAR's and Plaintiffs' own interpretation—*permits* the conduct Monestier describes. Monestier Br., at 48–49.

Plaintiffs dismiss Monestier as merely "quibb[ling]" over the settlement's language. Plaintiffs' Br., at 44. But in a settlement of this magnitude, clarity should be the baseline. The irony is that Plaintiffs criticize a contracts professor for scrutinizing contract terms. As someone who has taught contract law for sixteen years, Monestier is exactly the kind of person who should be—despite Plaintiffs' pejorative use of the term—"second guessing" the value of the settlement for absent class members. *Id.*, at (i), 42.

## IV. PLAINTIFFS DO NOT ADEQUATELY RESPOND TO ENFORCEMENT CONCERNS

Stripped to its essence, enforcement of this settlement consists of three things: (1) class counsel may (but is not required to) ask NAR for proof of compliance, which NAR will provide; (2) class members may inquire with NAR about a released party's purported compliance with the settlement, and NAR alone gets to determine whether that party is compliant; and (3) the court retains jurisdiction over the settlement. This hardly seems like a robust system of enforcement to police the conduct of 1.5 million realtors, thousands of MLSs and realtor associations, and dozens of opt-in brokerages.

Plaintiffs respond to these serious structural flaws by claiming that "counsel has already been pursuing [the] enforcement mechanism" that allows them to demand proof of compliance. Plaintiffs' Br., at 47. In reality, class counsel only sprang into action four days after Monestier filed her opening brief, deciding to target the very realtor organizations *she* had identified as noncompliant.

Out of roughly 1,354 realtor associations nationwide, Plaintiffs chose to contact just 14. That is an enforcement rate among realtor associations of about 1 percent. And all but two of the 14 had been flagged in Monestier's objection. *See* R. Doc. 1522.[20] This hardly seems like a coincidence. Plaintiffs are selectively tailoring their enforcement to Monestier's filings.

Notably, the letters request "[a]ll documents relating to your positions on the use of 'Touring Agreements,' 'Showing Agreements,' or similar agreements between buyers and brokers." R. Doc. 1699–2, Exhibits A and B. But there is no such thing as "your position []" on touring agreements. For those subject to the settlement, the rules are the

---

[20] Monestier did not reference the Long Island Association of Realtors or the Idaho Association of Realtors.

rules. Either no-fee touring agreements with an anticipated bump-up in commission are allowed, or they're not. The enforced don't get to have "positions" on the settlement's rules.

The supposed right of class members to inquire with NAR about a released party's compliance with the settlement is equally meaningless. Monestier inquired whether ten realtor organizations were compliant with the settlement in light of concerns outlined in her original objection. NAR's response was one sentence: the ten organizations had satisfied the conditions for being a Released Party. Having NAR, the subject of enforcement, also serve as the sole arbiter of other parties' compliance with the settlement makes absolutely no sense.

Monestier's original enforcement argument stands unrebutted. In a settlement involving the conduct of over one million realtors, selective and non-public inquiries by class counsel and the "right" of class members to make an inquiry to NAR is simply *not* enforcement.

## V.   PLAINTIFFS AND NAR DO NOT ENGAGE SERIOUSLY WITH CONSTITUTIONAL DUE PROCESS CONCERNS

Monestier raised two issues of due process: that the district court's opinion was secretly written by Plaintiffs without notice to class members or *pro se* objectors, and that class members were ordered to

appear in person at a fairness hearing after being assured that their written objections would be considered. Appellees do not adequately engage with either.

A. Plaintiffs Believe It Is Acceptable to Secretly Ghostwrite the Order Approving Their Own Settlement and Fees

Plaintiffs refuse to acknowledge that a judicial opinion approving one of the largest antitrust settlements in U.S. history that is written by its proponents who stand to make $333 million *just might* be problematic. Instead, they believe that "[t]he practice is unobjectionable"—a position squarely at odds with Supreme Court and appellate court precedent that they fail to either cite or grapple with. Plaintiffs' Br., at 66.

Plaintiffs consider ghostwriting acceptable because, in their view, it is authorized by local rules. The practice is *not* authorized by local rules; local rules do not permit *ex parte* filings. But there is no point arguing about local rules, because local rules do not supersede constitutional due process. FED. R. CIV. P. 83(A)(1) (local rules must be consistent with federal law); *E.g., In re Equifax Inc. Customer Data Sec. Breach Litig.*, 999 F.3d 1247, 1270 (11th Cir. 2021) ("Judicial ghostwriting remains most unwelcome in this Circuit. . . . [W]e strongly

urge the District Court to reconsider the local rule that brought about this problem in the first place.") (citations omitted).

Further, Plaintiffs believe the practice was acceptable because "their proposal carefully tracked and mirrored the District Court's many prior rulings in the case." Plaintiffs' Br., 66. The argument is wholly disingenuous. Plaintiffs' proposal tracked and mirrored *their own* previously written ghostwritten orders. That is the crux of Monestier's argument: Plaintiffs likely drafted *all* the relevant orders in this case, and the district court simply rubber-stamped them.

Plaintiffs and NAR downplay the massive scale of the ghostwriting. NAR falsely claims that the district court only adopted "portions" of the proposed order. NAR Br., at 15. Plaintiffs say the court exercised independent judgment because it "made changes as needed" and adopted "many portions of this proposal but changed others." Plaintiffs' Br., at 66–67. To be clear, the district court did not adopt "portions" of the Plaintiffs' order; it adopted *all* 79-pages virtually verbatim. The only "change[s]" it made consisted of adding boilerplate language to overrule objections on technical grounds. While Plaintiffs imply the court

independently added this language, they conspicuously avoid stating whether *they* provided the court with this language as well.

Appellees do not engage at all with the many arguments Monestier made showing that the district court did not exercise independent judgment when it adopted Plaintiffs' order virtually wholesale: the court signed off on orders containing errors, including one incorrectly stating that the multiplier was 1.17 and another incorrectly stating that the multiplier was 3.63; the court mischaracterized Monestier's arguments in ways that suggest it did not read her submissions; the court solicited the proposed order from class counsel specifically before the fairness hearing without notice to *pro se* objectors; the court issued the lengthy final order just 24-hours after the fairness hearing, an inadequate window to even verify the cited source material; the order cited to a study inaccessible without a paid subscription; and the court refused to acknowledge the pervasiveness of the ghostwriting.

How can an order that contains the wrong multiplier and replicates typographical errors be anything but "blindly accept[ed]"? Plaintiffs' Br., 67. How does wholesale adoption of 79-pages of text constitute

independent judgment? Appellees refuse to engage with these questions, insisting that "there's nothing to see here, folks."

NAR, for its part, echoes Plaintiffs' arguments about the propriety of judicial ghostwriting. NAR cites to an administrative decision involving a disciplinary complaint, *In re Doe*, 640 F.3d 869, 872–73 (8th Cir. 2011), for the proposition that federal courts ask parties to submit proposed orders "every day" and therefore a "court's use of the proposed order for its defined purpose can hardly be the basis for a valid objection." NAR Br., at 28. The judicial council in *In re Doe* said no such thing. *In re Doe* concerned a judge "borrow[ing]" about 55% of its order from the defendant's brief. By way of analogy, the court noted this "reflects the historic practice of a judge asking the prevailing party to prepare proposed findings of fact and conclusions of law and even the order itself." *In re Doe*, 640 F.3d 869, 872 (8th Cir. 2011). The judicial council then cited the leading Eighth Circuit authority on judicial ghostwriting, which NAR conspicuously omits from its brief:

> This practice has been severely criticized as the failure of the trial judge to perform his judicial function and when it occurs without notice to the opposing side . . . it amounts to a denial of due process.

*Id.*, at 872, citing *Bradley v. Md. Cas. Co.,* 382 F.2d 415, 423–24 (8th Cir. 1967). Far from lending support to judicial ghostwriting, *In re Doe* expresses skepticism of the practice. So does every other Eighth Circuit case that has considered this issue. *See, e.g.*, *Askew v. United States*, 680 F.2d 1206, 1209 (8th Cir. 1982) ("we disapprove of the court placing its imprimatur on such proposed findings by wholly adopting them as the court's own.").

Moreover, ghostwriting in the class action context is categorically different from ghostwriting in the ordinary adversarial setting. In a typical dispute, the court's task is to resolve a contest between opposing parties. In the class action settlement context, by contrast, the court does not merely adjudicate a dispute between adversaries. Instead, it serves as a fiduciary for absent class members who are not before the court. Delegating the very process of reasoning and drafting of a judgment to a party that stands to gain financially from approval of the settlement is an abdication of that duty.

The bottom line is this. In a class action settlement releasing the legal claims of 40 million people, the near verbatim adoption of a non-public, party-drafted order cannot be squared with Rule 23(e)'s demand

for independent judicial judgment, or with the constitutional guarantee of due process.

B. Appellees Turn a Blind Eye to the Due Process Problems with the Court's In-Person Order

Appellees suggest there was nothing unusual about a court imposing a requirement on objectors to appear at the fairness hearing in person after class notice assured them that they didn't have to. Plaintiffs claim that "courts impose similar requirements all the time" and that in-person attendance is a "normal part of litigation." Plaintiffs' Br., at 62–63. But there was nothing "normal" about this in-person order, or about the court striking almost 95% of objections for failure to comply with it. Appellees cite no precedent even tangentially on point, citing mainly unpublished (and non-precedential) opinions where the requirement to appear in person was contained in the class notice.

Plaintiffs go so far as to suggest that it is not even burdensome for class members to make a pilgrimage to Missouri to preserve their right to object. They assert, straight-faced, that "Although the defaulting Objectors considered [in-person attendance] oppressive, appearing for a single afternoon hearing is a small burden given the stakes involved: industry-wide practice reforms and hundreds of millions of dollars in

recovery." Plaintiffs' Br., at 64. NAR likewise defends the requirement: "Objectors instead insist that they should have been allowed to attack the centerpiece of a $1 billion settlement benefitting tens of millions of Americans without showing up." NAR Br., at 26. But NAR ignores the obvious: objectors in every other class action in history have been allowed to "attack" a settlement without showing up—especially where, as here, the notice expressly told them they didn't need to.

The arrogance of these statements underscores just how out of touch Appellees' high-priced lawyers are from the realities faced by the forty million class members at the center of this case. It is not reasonable to expect anyone to spend over a thousand dollars out-of-pocket to contest a settlement that will net them $16.

Appellees also fail to acknowledge the obvious consequences of their position. If upheld, the in-person order sets a dangerous precedent that effectively guts the Rule 23 objection process. Courts could simply impose in-person attendance requirements *post hoc*, knowing most class members will be unable to comply, and then strike objections for failure to appear. That is exactly what happened here.

## VI. PLAINTIFFS FAIL TO ADDRESS THE ARGUMENT THAT A RECOVERY OF 0.1% OF ACTUAL DAMAGES DOES NOT WARRANT A THIRD-OF-A-BILLION-DOLLAR FEE AWARD

Revealingly, Plaintiffs' brief devotes far more attention to defending their entitlement to $333 million in fees than to addressing Monestier's legal arguments about why the settlement fails to satisfy Rule 23, violates constitutional due process, and lacks Article III standing.

Plaintiffs never once mention the most crucial number in Monestier's brief: 0.1%. That omission is likely because they would prefer this Court to overlook that the settlement they believe is so historic yields just 0.1% of a class member's actual losses. By any reasonable measure, that result is not meaningful.

It may be that $16 per class member is all the real estate industry could afford to pay; while it seems unlikely, Monestier does not argue otherwise. But the fee determination does not turn on whether Plaintiffs extracted a settlement that was "the most . . . Defendants reasonably could pay," Plaintiffs' Br., at 4, or whether class counsel squared off against "more than 20 top national defense firms." *Id.*, at 2. It turns on

what class counsel actually delivered to class members. Here, the monetary recovery was paltry, and the practice changes were illusory.

Plaintiffs attempt to justify their outsized fee by directing this Court's attention to the splashy headline number: $1 billion. But that figure is meaningless without context. And context is readily available in the very case Plaintiffs continue to cling to as analogous—*Allapattah Services, Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1205 (S.D. Fla. 2006).[21] There, class members received "[f]ull and complete recovery," and the claims rate was an "unprecedented" 92%. Here, class members recover almost nothing: a tenth-of-a-penny on the dollar and injunctive relief that will almost certainly make no difference in class members' lives. Context matters. Plaintiffs want an A+ for effort, not for the results they delivered to the 40 million class members they represent.

## CONCLUSION

Plaintiffs' brief reads less like a reasoned explanation of why the settlement is fair, adequate, and reasonable to 40 million class members under Rule 23, and more like a victory lap. Plaintiffs describe their case

---

[21] Plaintiffs mischaracterize *Allapattah* as declaring a $1.075 billion settlement an "exceptional success" *because* of its size. *Allapattah* made no such causal connection.

as a "pathbreaking challenge to anticompetitive rules in the residential real estate industry," undertaken to "reform the residential real estate industry" and "save home sellers billions." Plaintiffs' Br., at (i), 1, 12. They recount the number of top firms they claim to have defeated, the "hard-fought" negotiations they engaged in, the millions of documents they reviewed, the impressive experts they retained, and the tens of thousands of hours they billed. Plaintiffs' Br., at (i), 12, 53. They insist that the settlements are not just "significant" but "historic," delivering "record-breaking" relief and "reshap[ing] the residential real estate market." *Id.*, at 16, 19, 51. Plaintiffs invoke virtually every superlative available.

Against this self-laudatory backdrop, Plaintiffs treat objectors with thinly-veiled derision. They refer to one objector as a "serial pro se litigant," other objectors as "copycat" litigants who were "recruited by lawyers," and other objectors as "disgruntled real estate professionals." *Id.*, at 10, 64. This Court has disapproved of such *ad hominem* attacks in the past. *See In re T-Mobile Customer Data Sec. Breach Litig.*, 111 F.4th 849, 858 (8th Cir. 2024).

Plaintiffs portray Monestier as a meddlesome professor who lacks "expertise in antitrust or economics . . . [or] real estate," and dares to "second-guess" their work. *Id.*, at (i), 11, 42. Plaintiffs critique Monestier for "offer[ing] nothing remotely as beneficial" as the changes they negotiated. *Id.*, at 42, 44. They characterize Monestier as "quibbl[ing] about particular settlement language," and "complain[ing]" about various aspects of the settlement. *Id.*, at 44–45. What Plaintiffs *do not do* is engage meaningfully with the legal arguments Monestier presented. They spend pages extolling their own virtues and the scale of their effort, while offering almost nothing of substance in response to Monestier's Article III, Rule 23, and due process arguments.

Ordinarily, Monestier would not dwell on tone or rhetoric. But Plaintiffs' brief is strikingly dismissive of class members and objectors, the very people counsel is tasked with representing. This raises legitimate questions about whether the settlement approval process— characterized by a wholesale adoption of non-public, Plaintiff-drafted orders—fully accounted for the interests of class members.

These concerns are not academic. They reflect a deeper failure of the settlement process. The court did not act as an independent check on

the settlement, but as a conduit for effectuating what Plaintiffs proposed and drafted. The court approved a settlement without scrutinizing whether the class representatives had Article III standing or whether the relief meaningfully benefited the individuals who comprise the class. This Court should reverse.

Dated:  November 11, 2025          Respectfully submitted,

/s/  Tanya Monestier
_____

Tanya Monestier
*Objector-Appellant*
101 Charleston Ave
Kenmore, NY
14217
Phone: (401) 644-2383
Email: tanyam@buffalo.edu

## CERTIFICATION OF COMPLIANCE

This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because:

1. This brief is 6,477 words long, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It has been prepared in proportionally spaced typeface using Microsoft Word Century Schoolbook 14-pt font.

This brief complies with 8th Cir. R. 28A(h) because the PDF file has been scanned for viruses by Microsoft Defender Antivirus and is said to be virus-free by that program.

Dated:  November 11, 2025          Respectfully submitted,

                                   /s/


                                   Tanya Monestier

## CERTIFICATION OF SERVICE

I hereby certify that on November 11, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the CM/ECF system.

Dated: November 11, 2025                Respectfully submitted,

                                        /s/

                                        Tanya Monestier